STATE OF CONNECTICUT *v.* JEROME WILLIAMS
(12244)

PETERS, C. J., HEALEY, CALLAHAN, BORDEN and FRACASSE, Js.

Argued April 2—decision released July 28, 1987

*Alexander H. Schwartz,* with whom were *Michael R. Sheldon* and, on the brief, *Todd D. Fernow* and *Shawn G. Tiernan* and *Richard Aries,* legal interns, for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom, on the brief, was *Thomas V. O'Keefe, Jr.,* assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of conviction, after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (3), and risk of injury to a minor in violation of General Statutes § 53-21. He claims that (1) the trial court erred in permitting the state to impeach its own witness where the primary purpose of the impeachment was to place otherwise inadmissible statements before the jury for use as substantive evidence, and (2) the conduct of the assistant state's attorney during cross-examination of the defendant and his principal witness, and during closing argument, deprived him of his right to an impartial jury and a fair trial. We find error.

The state's evidence established the following facts. Carrie Payne was the mother of Damon Payne, age eight, Derek Payne, age six, and the victim, Walter Payne, age five. In July, 1982, Carrie Payne visited Detroit, Michigan, for approximately four days, leaving the children in the care of the defendant at her apartment in New Haven. Although Carrie Payne, initially and until nearly the close of the trial, referred to the defendant as her "boyfriend," it was ultimately established that they were married to each other. When Carrie Payne arrived home from Detroit shortly after midnight on July 31, 1982, the three children were unattended. Walter was unclothed and unconscious in his bed. She took him to the hospital by ambulance. He was comatose, and had suffered trauma to his face, stomach, kidneys and back. He had serious internal injuries, a cerebral contusion and possible permanent brain damage. His injuries, which were life-threatening, were consistent with a beating by a long thin instrument such as an extension cord or clothes hanger, and inconsistent with an accident.

After Carrie Payne left for the hospital, the police were dispatched to the house. At this time, Officer Melvin Daniels of the New Haven police department spoke to Damon Payne. He also spoke to a neighbor and obtained a description of the defendant. Daniels went outside where he saw the defendant. Upon seeing Daniels, the defendant began to run. Daniels apprehended the defendant, after finding him lying on his stomach hiding in the grass.

The defendant testified that Carrie Payne had left her three children in his care when she went to Detroit, and that while Walter was in his care, Walter's stomach became distended from drinking too much water. The defendant fed him baking soda, and pressed on his stomach causing him to vomit water. The defendant denied beating Walter. He testified further that at

approximately 7:30 p.m. on July 30, 1982, he left the children in the apartment in the care of an acquaintance, James Davis, while he and another friend, Kevin Edwards, went out drinking, smoking marijuana, and snorting cocaine.

Carrie Payne was also called as a defense witness. Her testimony was often contradictory and included a version consistent with that of the defendant, namely, that when she returned to her apartment from Detroit, James Davis was there and that he, not the defendant, had beaten Walter. She testified that Davis was her lover, but not her boyfriend. She further testified that Davis was in New Haven, and that she was afraid of him. On cross-examination, she testified that she knew Davis' telephone number, but she refused to divulge it. She also denied making certain prior statements to police officers and medical personnel that were inconsistent with her direct testimony.

As part of its case in rebuttal, the state attempted to impeach Carrie Payne by calling several witnesses to testify as to her prior inconsistent statements. The state first presented Detective Melvin Wearing of the New Haven police department. He testified that Carrie Payne had told him that "James Davis" was a fictitious name, that the defendant had beaten Walter, and that she had used the name "James Davis" because at first she wanted to "get even" with the defendant herself.

The state also called Elizabeth Ann Weisner, who was the attending physician upon Walter's admission to the hospital. She testified to statements made by Carrie Payne during the course of giving a history pursuant to Walter's admission. Those statements contained the following information: Carrie Payne had left her children with her "boyfriend," James Davis, while she went to Detroit. She had called from Detroit earlier that day

and was told that Walter was sick. She had told "the boyfriend" to take Walter to the emergency room. She returned home from Detroit, and when she found Walter undressed and unresponsive, she brought him to the hospital by ambulance. The police detective who had talked to Damon told her that "the boyfriend" had beaten Walter twice with a cord from an iron while Walter was under a chair in the apartment.

The state also called in rebuttal Robert Ferm, who was a resident physician in the pediatric intensive care unit on July 31, 1982. He testified to the following statements given by Carrie Payne: Carrie Payne had left Walter and his two brothers in the care of a thirty-four year old[1] "boyfriend" of hers. On the morning of July 30, 1982, "the boyfriend" told Carrie Payne in a telephone conversation that Walter had a swollen belly from drinking too much water, and that the boyfriend was angry. Further telephone calls made Carrie Payne suspicious that "the boyfriend" was drinking and was beating Walter. Carrie Payne took an airplane home, and on arrival at about 12:15 a.m. found Walter to be lethargic and unarousable, and took him by ambulance to the hospital. She mentioned no one except her thirty-four year old boyfriend as responsible for Walter's condition.

I

The defendant first claims that the trial court erred by permitting the state to impeach its own witness, Damon Payne, by use of his prior inconsistent statements. The defendant argues that the state introduced the statements under the guise of impeachment for the primary purpose of inducing the jury to use the state-

---

[1] There was testimony from the defendant that he was age thirty-five on July 31, 1982, and testimony from Carrie Payne that he was age thirty-four on that date.

ments substantively.[2] See *State* v. *Graham,* 200 Conn. 9, 18, 509 A.2d 493 (1986). The defendant further argues that the state failed to lay the proper foundation, by drawing Damon's attention to each alleged inconsistent statement, before introducing the statements into evidence. We disagree.

Damon Payne testified as follows. Damon and his brothers were under the care and supervision of the defendant on the day that Walter went to the hospital. Earlier that day, Derek had fed Walter a lot of water, causing Walter to wet his bed. Damon testified that the defendant had not become angry because Walter had wet the bed, and that the defendant had caused Walter to vomit water by feeding him baking soda and by putting him on the floor and pumping him. He also testified that he had not seen any other adult in the house that day or evening, and that he did not think the defendant had left the apartment that night. Damon testified that he remembered the ambulance coming for Walter, that Walter had been sick all night, and that he had put Walter to bed while the defendant was sitting in the living room. He testified further that Walter had not been able to talk to him after lunch, and that Walter had cried most of the day.

Damon further testified that he did not remember the police coming to his house or telling them what happened to Walter. When the assistant state's attorney

---

[2] Initially, the defendant claimed in this court that the trial court erred because the state was not genuinely surprised by the testimony of the witness and because the testimony was not substantively adverse to the state's case. After the defendant's brief was filed, however, this court decided *State* v. *Graham,* 200 Conn. 9, 17, 509 A.2d 493 (1986), in which we held "that the credibility of a witness may be impeached by the party calling [him] without a showing of surprise, hostility, or adversity. A party may impeach its own witness in the same manner as an opposing party's witness and may demonstrate the witness' bias or bad character for veracity and may impeach the witness using prior inconsistent statements." In his reply brief, the defendant has refined his claim to conform to *State* v. *Graham,* supra. See text, infra.

asked whether he remembered telling Officer Daniels that Walter had been beaten, the defendant objected and the jury was excused. In the absence of the jury, Damon repeated that he did not remember telling Daniels that the defendant had beaten Walter with an extension cord and clothes hanger, that he did not remember the police returning to the apartment with the defendant, and that he did not remember identifying the defendant as the person who had beaten Walter. The state thereafter sought to have Damon declared a hostile witness and to be permitted to impeach him with his prior inconsistent statements. The court ruled that Damon's prior inconsistent statements could be introduced, and the defendant took an exception. The state indicated that, because it expected Damon to continue to assert his lack of memory about speaking to the police, it would offer the prior inconsistent statements through Daniels without first asking Damon about them in the presence of the jury. The state thereafter called three officers to the witness stand to testify to Damon's prior inconsistent statements.

Daniels testified as follows. When he arrived at the Paynes' apartment, the first person he met was Damon, who "said his little brother just got beat by the father." Damon identified "the father" by the name of "Jerome." Damon also told him that Jerome had done this "[w]ith a [clothes] hanger and an extension cord." Daniels also testified that, after apprehending the defendant, he had returned to the scene with the defendant and Damon identified the defendant. Detective Wearing testified that Damon had identified the defendant while he was in the custody of Daniels. He also testified that Damon had pointed out the clothes hanger and the extension cord. Detective Alan Smith of the New Haven police department testified as follows. He spoke to Damon on the morning of July 31, 1982, and Damon "told [him] that Walter Payne was

lying on the bed and he was asleep, and that Mr. Williams wanted him to get out of bed. He also mentioned that Walter was sick,' that he didn't feel like getting out of bed. As a result of him not getting out of bed, Mr. Williams took a clothes hanger and a iron cord and began to beat him.''

In *State* v. *Graham,* supra, 17, we were ''persuaded by the weight of authority that there is no longer justification for the common law rule prohibiting a party from impeaching his own witness. Witnesses do not 'belong' to the party who called them; *Gervais* v. *Foehrenbach,* 149 Conn. 461, 463, 181 A.2d 253 (1962); and a party no longer vouches for the credibility of his own witness. In many situations a party may have to call a particular witness to the stand even though the testimony will not be completely favorable. If the unfavorable testimony is inaccurate and impeachment is not allowed, the inaccuracies will go unexposed and the truthfinding function of our trial system will be hindered. See *Fox* v. *Schaefer,* 131 Conn. 439, 449, 41 A.2d 46 (1944). We therefore hold that the credibility of a witness may be impeached by the party calling [the witness] without a showing of surprise, hostility or adversity. A party may impeach his own witness in the same manner as an opposing party's witness and may demonstrate the witness' bias or bad character for veracity and may impeach the witness using prior inconsistent statements.''

By this holding, however, we did ''not mean to intimate that a state's attorney enjoys unfettered discretion in calling a witness and impeaching [his] credibility by use of inconsistent statements. The prosecution may not use a prior inconsistent statement under the guise of impeachment for the primary purpose of placing before the jury evidence which is admissible only for credibility purposes in hope that the jury will use it substantively.'' *State* v. *Graham,* supra, 18.

We have established a two-pronged test for the application of the principles we adopted in *State* v. *Graham,* supra. "The introduction of the [prior inconsistent] statement is improper . . . where the primary purpose of calling the witness is to impeach him and the state's attorney introduces the prior inconsistent statement in hope that the jury will use it substantively." *State* v. *Jasper,* 200 Conn. 30, 34, 508 A.2d 1387 (1986); *State* v. *Rivera,* 200 Conn. 44, 49, 509 A.2d 505 (1986). Under the facts of this case, neither prong of the test was violated.

First, we cannot conclude from this record that the state called Damon Payne for the primary purpose of impeaching him. He was the only functionally available eyewitness to the events which took place in Carrie Payne's apartment on July 30, 1982, in light of the even more tender years of his brothers. Indeed, the defendant does not suggest that the failure of the state to call either of those young witnesses gave rise to an unfavorable inference. See *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). Damon was the only witness available to the state to establish the critical fact that the defendant was the only adult in the apartment on that date. Furthermore, through Damon the state was able to establish that the defendant had some physical contact with the five year old victim, albeit not the physical contact at issue. Damon testified that the defendant had fed Walter baking soda and pumped his distended stomach, causing him to vomit water. The inappropriateness of this contact lends support to the state's contention of much more serious contact. Additionally, it was only through Damon that the state was able to establish that Walter had been sick all night and that it was Damon, not the defendant, who attended to him while the defendant sat in the living room. Further, Damon testified that Walter was unable to speak from lunch time on, and

that he cried throughout the day. This evidence was consistent with the state's contention that the defendant had beaten Walter. Compare *United States* v. *Hogan,* 763 F.2d 697 (5th Cir. 1985) (where the government called a witness who had no significant inculpatory evidence to offer other than his prior inconsistent statements which the government knew he had repudiated).

Second, this record does not indicate that Damon's prior inconsistent statements were introduced in hope that the jury would use them substantively. In this connection, the defendant claims that in the state's closing argument, the state urged the jury to use Damon's prior inconsistent statements substantively.[3] Read in context, however, the portion of the state's closing argument referring to Damon's prior inconsistent statements constituted permissible argument to the jury; that is, in deciding the credibility of that portion of Damon's testimony which tended to exculpate the defendant, the jury should consider his credibility as impacted by his prior inconsistent statements. The gist of the state's argument was that "even though Damon's story indicated that this man was simply trying to help the little boy . . . [y]ou have to balance out the parts that are favorable to [the defendant]. You have to balance them by the original story that he gave to the police in deciding whether the subsequent story

---

[3] The assistant state's attorney argued: "As you will recall, even though Damon's story indicated that this man was simply trying to help the little boy, his story did not include any testimony about another person. His story never included being supervised by another person. His story never included this man leaving that apartment. You have to balance out the parts that are favorable to Mr. Williams. You have to balance them by the original story that he gave to the police in deciding whether the subsequent story he told here is the complete one.

"You know that he told Officer Daniels that Jerome—and he used the name Jerome—beat Walter with a hanger, an iron cord. These items are in evidence. They were pointed out by the young boy on the night of the incident, the first 24 hours."

he told here is the complete one." The point of this argument was to suggest that Damon's testimony had been shaped by the defendant and Carrie Payne, and that therefore, the jury should disbelieve the exculpatory portion.

The defendant also points to references in the state's closing argument to testimony that the victim was hiding under a chair while the defendant pursued him and beat him. A careful review of the transcript reveals that this testimony came from a witness who was called for a purpose other than to testify to Damon's inconsistent statements. Weisner provided this testimony based on information given to her from Carrie Payne pursuant to Walter's admission to the hospital. This evidence was introduced to impeach Carrie Payne's testimony, not to impeach Damon's testimony. While the assistant state's attorney may have wrongfully urged it upon the jury for consideration of it substantively; see part II, infra; the defendant has not made the introduction of that testimony a subject of this claim of error. The state's reference to that evidence does not support the defendant's claim that the state introduced Damon's prior inconsistent statements in hope that the jury would use them substantively.

Additionally, we note that while the defendant presses the claim that prior inconsistent statements were used substantively to his prejudice during closing argument, he did not object on this basis at trial. This sends a powerful signal that he did not hear the argument as an attempt by the state to induce the jury to use Damon's prior statements substantively. See *State* v. *Lubesky*, 195 Conn. 475, 484, 488 A.2d 1239 (1985). Moreover, any harm resulting from the use of Damon's prior inconsistent statements was eliminated by the trial court's charge to the jury, which specifically and repeatedly instructed the jury that it could use those statements only for purposes of assessing

credibility and not "as evidence in the case to help prove one of the elements of a crime." Absent a fair indication to the contrary, the jury is presumed to follow the court's instructions. *State* v. *Glenn,* 194 Conn. 483, 497, 481 A.2d 741 (1984). There is nothing in this record to suggest that it did not do so.

The defendant claims further that the state did not follow the proper procedure for introducing Damon's prior inconsistent statements. After eliciting from Damon that he did not remember talking to the police, the state called its witnesses and through them introduced Damon's prior inconsistent statements without first asking him if he recalled making the statements. The defendant claims that impeachment of a witness by use of a prior inconsistent statement is permissible only if the impeaching party first elicits from the witness a specific lack of recollection of each inconsistent statement. This claim misstates our law.

As noted above, in *State* v. *Graham,* supra, 17, we held that "[a] party may impeach his own witness in the same manner as an opposing party's witness." This includes impeachment by use of prior inconsistent statements. Id. Generally, before impeaching an opposing party's witness by use of his prior inconsistent statements, a foundation should be laid. We have stated, however, that "we have no inflexible rule regarding the necessity of calling the attention of a witness on cross-examination to his alleged prior inconsistent statements before either questioning him on the subject or introducing extrinsic evidence tending to impeach him. From early times, it has consistently been held that it rests within the judicial discretion of the trial court whether to admit the impeaching statement where no foundation has been laid. *Fairbanks* v. *State,* 143 Conn. 653, 657, 124 A.2d 893 [1956]. The trial court is vested with a liberal discretion as to how the inquiry should be conducted in any given case." *State* v. *Saia,*

172 Conn. 37, 46, 372 A.2d 144 (1976); see also *G & R Tire Distributors, Inc.* v. *Allstate Ins. Co.,* 177 Conn. 58, 61, 411 A.2d 31 (1979). Nor is it of any significance that the inconsistency arises from an assertion of lack of memory by the witness. "[I]nconsistencies may be found in changes in position and they may also be found in denial of recollection. See 3 Weinstein, Evidence § 607 (6) (1985). The trial court has considerable discretion to determine whether evasive answers are inconsistent with prior statements." *State* v. *Whelan,* 200 Conn. 743, 748–49 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 1598 (1986).

In this case, the state elicited from Damon in the presence of the jury that he did not remember talking to the police or telling them that the defendant beat Walter. He repeated this lack of recollection in more specific terms in the jury's absence. The trial court did not abuse its wide discretion in permitting the inquiry to be conducted as it was.

## II

The defendant next claims that the misconduct of the assistant state's attorney during cross-examination of the defendant and his principal defense witness, Carrie Payne, and during closing argument, was so egregious as to deny him a fair trial. We agree.

We first consider the state's argument that the defendant's claim is not reviewable because he took none of the appropriate measures to alert the trial court to a potential problem; namely, the defendant did not object to the portions of the cross-examination of which he now complains, he did not object to the state's closing argument, he made no request to the court for appropriate curative instructions, and he made no motion for a mistrial. In support of its argument, the state points to a line of cases in which we have declined to review, under *State* v. *Evans,* 165 Conn. 61, 70, 327

A.2d 576 (1973), claims of prosecutorial misconduct which were not properly preserved at trial. See *State* v. *Chace*, 199 Conn. 102, 107–108, 505 A.2d 712 (1986); *State* v. *Tyler-Barcomb*, 197 Conn. 666, 672–74, 500 A.2d 1324 (1985); *State* v. *Lubesky*, supra, 483–84.

The defendant argues, on the contrary, that his claim of error was adequately preserved because the trial court was sufficiently alerted to the claim of misconduct by the defendant's repeated and successful objections during the cross-examinations in question. He argues that the assistant state's attorney, in closing argument, simply continued the improper themes which the assistant state's attorney had begun during cross-examination and to which defense counsel had repeatedly objected. The defendant argues alternatively that his claim of error is independently reviewable under *State* v. *Evans*, supra, *State* v. *Findlay*, 198 Conn. 328, 344, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 921 (1986), *State* v. *Pelletier*, 196 Conn. 32, 33–34, 490 A.2d 515 (1985), *State* v. *Glenn*, supra, 491, and under the plain error doctrine. Practice Book § 4185.

Our review of the record indicates that the defendant did not properly preserve this claim at trial. We conclude, however, that his claim is reviewable under the second exceptional circumstance of *State* v. *Evans*, supra, because the defendant has raised a claim, adequately supported by the record, that he clearly has been deprived of a fundamental constitutional right and a fair trial. Id., 70. In *State* v. *Findlay*, supra, *State* v. *Pelletier*, supra,[4] and *State* v. *Glenn*, supra, we reviewed claims of prosecutorial misconduct during

[4] In *State* v. *Pelletier*, 196 Conn. 32, 34, 490 A.2d 515 (1985), our determination of reviewability was partially influenced by the fact that the trial court had been adequately alerted by a codefendant. See *State* v. *Couture*, 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

closing argument under *State* v. *Evans,* supra, and in *State* v. *Pelletier,* supra, we reversed the conviction because of that misconduct. In the cases in which we have denied *Evans* review, the claimed misconduct consisted of isolated and brief episodes, and did not reveal a pattern of conduct repeated throughout the trial. Moreover, the misconduct was not blatantly egregious. See *State* v. *Chace,* supra, 107; *State* v. *Tyler-Barcomb,* supra, 673; *State* v. *Lubesky,* supra, 483. Thus, we concluded in each of those cases that the record did not adequately support the defendant's claim that he was clearly deprived of a fundamental constitutional right and a fair trial so as to warrant review under *Evans.* See, e.g., *State* v. *Chace,* supra, 108 n.2. In this case, however, the defendant claims that the assistant state's attorney committed serious misconduct throughout his cross-examination of the defendant and of Carrie Payne, and during large portions of his closing argument. Because the record adequately supports that claim, we review it. *State* v. *Evans,* supra.

We have long recognized the special role played by the state's attorney in a criminal trial. "He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-

established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone,* 96 Conn. 160, 168–69, 113 A. 452 (1921).

"Or to put it another way 'while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' *Berger* v. *United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). 'A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows.' *Viereck* v. *United States,* 318 U.S. 236, 253, 63 S. Ct. 561, 87 L. Ed. 734 (1942) (Black, J., dissenting). In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions; *State* v. *Ferrone,* supra, 163; and those which are flagrant and therefore deny the accused a fair trial. *State* v. *Chapman,* 103 Conn. 453, 477, 130 A. 899 (1925). In determining whether the defendant was denied a fair trial we must view the prosecutor's comments in the context of the entire trial. *State* v. *Kinsey,* 173 Conn. 344, 348–49, 377 A.2d 1095 (1977)." *State* v. *Haskins,* 188 Conn. 432, 457, 450 A.2d 828 (1982).

Prosecutorial misconduct may occur in the course of cross-examination of witnesses; *State* v. *Hafner,* 168 Conn. 230, 249, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); and may be so clearly inflammatory as to be incapable of correc-

tion by action of the court. Id., 252–53. "In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal." Id., 253.

Prosecutorial misconduct may also occur in the course of closing argument. *State* v. *Pelletier,* supra; *State* v. *Couture,* 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Such argument may be, "in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." *State* v. *Fullwood,* 194 Conn. 573, 585, 484 A.2d 435 (1984).

The defendant claims that the prosecutorial misconduct in this case was so egregious that it deprived him of his constitutional right to a fair trial under the due process clause of both the state and federal constitutions.[5] In analyzing the defendant's claim, we ask whether the prosecutor's conduct " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden* v. *Wainright,* 477 U.S. 168, 181, 106 S. Ct. 2464, 80 L. Ed. 2d 223 (1986), quoting *Donnelly* v. *DeChristoforo,* 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); *State* v. *Hawthorne,* 176 Conn. 367, 372, 407 A.2d 1001 (1978). We do not focus alone, however, on the conduct of the prosecutor. " 'The fairness of the trial and not the cul-

[5] The constitution of Connecticut, article first, § 8, provides in pertinent part that "[n]o person shall be . . . deprived of . . . liberty . . . without due process of law . . . ." The fourteenth amendment to the United States constitution provides in pertinent part: "nor shall any state deprive any person of life, liberty or property, without due process of law . . . ." The defendant also claims that his right to a trial before an impartial jury was implicated by the prosecutor's misconduct in this case. Because of our disposition of this case under the due process clauses of both the state and federal constitutions, we do not reach this claim.

pability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct.' " *State* v. *Palmer,* 196 Conn. 157, 163, 491 A.2d 1075 (1985), quoting *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see also *Darden* v. *Wainright,* supra; *State* v. *Doehrer,* 200 Conn. 642, 654, 513 A.2d 58 (1986).

In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Fullwood,* supra; *State* v. *Falcone,* 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica,* 663 F.2d 1173, 1181 (2d Cir. 1981); the frequency of the misconduct; *State* v. *Couture,* supra, 562–63; see *State* v. *Doehrer,* supra, 654; *State* v. *Palmer,* supra, 163; the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States,* 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica,* supra; *Harris* v. *United States,* 402 F.2d 656, 657 n.1 (D.C. Cir. 1968); *State* v. *Doehrer,* supra; and the strength of the state's case. See *United States* v. *Modica,* supra; *State* v. *Couture,* supra, 564; *State* v. *Glenn,* supra, 492.

The record in this case discloses a pattern of misconduct, repeated and strident, by the assistant state's attorney during both the cross-examination of the defendant and of his key defense witness, and during closing argument. This misconduct falls within at least four categories of proscribed behavior: (1) expressions of opinion by the prosecutor as to witness credibility and the ultimate issue of the defendant's guilt; (2) sug-

gestions that the jury draw inferences from facts not in evidence; (3) appeals to the passions and emotions of the jurors; and (4) injection of extraneous matters.

## PERSONAL EXPRESSION OF OPINION

The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. *United States* v. *Modica,* supra; *United States* v. *Drummond,* 481 F.2d 62 (2d Cir. 1973); *State* v. *Floyd,* 10 Conn. App. 361, 365, 523 A.2d 1323 (1987); ABA Standards for Criminal Justice (Second), The Prosecution Function § 3-5.8 (b) (1985) (hereinafter ABA Standards).[6] Nor may he express his opinion, directly or indirectly, as to the guilt of the defendant. *Harris* v. *United States,* supra, 658; ABA Standards, supra. Such expressions of personal opinion are a form of unsworn and unchecked testimony. The assistant state's attorney, in this case, nonetheless repeatedly rendered his opinion, both directly and indirectly, on the credibility of the testimony of the defendant and his key defense witness, Carrie Payne, during both cross-examination and closing argument.[7] He

---

[6] The prosecutor may, however, argue to the jury that the *evidence* and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses. *United States* v. *Drummond,* 481 F.2d 62 (2d Cir. 1973); *Harris* v. *United States,* 402 F.2d 656 (D.C. Cir. 1968).

[7] We emphasize that the quotations from the assistant state's attorney's cross-examination and closing argument given in this and the subsequent footnotes are only examples of the misconduct. The record discloses other similar examples which we have not quoted.

A sample of improper cross-examination of the defendant is as follows:

"Q. Where did [Kevin] get [the marijuana]? Where? Don't give me this 'around the corner.' Where did he get it?

"A. Apartment building right around the corner on—I don't know the name of the street.

"Q. You don't know where it is actually, do you?

"A. I know where it is, you know, but—I could go there. I don't want to put on who's selling marijuana and put me in the spot.

"Q. Oh, really. You're not in the spot right now, are you?

expressed his opinion, frequently and vitriolically, as to the defendant's guilt. These expressions of opin-

"A. Yes, I am.

"Q. It's tough to make up these answers as you go along isn't it?

"A. No, because I'm telling the truth. I know what I'm talking about.

"Q. *You are, right. Yeah, you do.*

"*A.* It's on Dwight Street.

"A. *You're a little late."* (Emphasis added.)

Samples of improper cross-examination of Carrie Payne are as follows:

"Q. Didn't you tell every single person you talked to that you weren't married to him?

"A. No.

"Q. You are a liar then, aren't you?

"Mr. Sturman: I would object to that, your Honor.

"The Court: It is argumentative. Sustained.

"Q. You say that there is a James Davis. *Caught you on that phone, number one, didn't I? The first one.*

"A. No, you did not.

"Q. *Made you look like a fool right off the bat. Can't even give a phone number because you know you don't have a phone, and you know that I know that, too.*

"A. I didn't say I have a phone number. I say I call him.

"Q. *You know I know you don't have a phone.*

"A. Everybody know I don't have a phone. He do. . . .

"Q. But you don't have his phone number. You can't tell us his phone number. When you were given the opportunity, you couldn't. You might be able to give us a number now, but you couldn't give a phone number when you were asked, could you? Could you?

"A. No, I couldn't. I still can't.

"Q. *Well, that doesn't surprise me.*

"A. I have it, but I can't give it to you.

"A. *Nonexistent person, nonexistent phone. Where do you get the nerve on a case like this to lie like this?*

* * *

"Q. The police were there when you talked to James Davis at your apartment?

"A. He was there.

"Q. Go ahead; come on.

"A. He was there.

"Q. James Davis was there in the apartment, the police were there and you were there?

"A. James Davis gave a statement there.

"Q. James Davis gave a statement there—

"A. To the police.

"Q. And the police were [there] and they buried that statement? *You're nuts, you know that? You're nuts.*

ion are particularly difficult for the jury to ignore because of the special position held by the prosecutor.

"Mr. Sturman: I object, your Honor.

"The Court: Sustained." (Emphasis added.)

A sample of improper closing argument is as follows: "By the way, that night, this is probably the closest to the truth that she ever got. It shouldn't be really any confusion in your minds. The story about the water in the belly comes from Jerome. The story about James Davis comes from Carrie Payne. She's changed her story to suit whatever testimony came from the police or from anybody else in this case. She changes her story at a whim. Being confronted with documented lies doesn't phase her a bit. Isn't it amazing how someone can look you right in the eye and lie right through their teeth? You would think that telling lies like that, that her nose would grow just like in Pinocchio.

"Once again, in an effort to really focus this case on what it should be focused on, consider the testimony of this man. When you heard it, it was incredible; but you've heard so many other stories since then, that it sort of really fades away. There are so many other bizarre, incredible lies in this case that you sort of forget that this guy comes up with a new story that no one's ever heard before, which is contradictory to the other three statements he made . . . ."

A sample of improper cross-examination is as follows:

"Q. In fact, everyone is lying in this case except you and Miss Payne?

"A. Well, I know I didn't beat the kid.

"Q. That's right.

"A. I know that.

"Q. Because you'd never do anything like that, would you?

"A. Not to no kids, no.

"Q. *Do you realize that you almost killed the child?*

"A. I didn't almost kill nobody, because I didn't beat anybody.

"Q. Why did you pick these instruments to beat the child?

"A. Look, I've been taking care of those kids a long time. If I was to beat them, I wouldn't beat them with anything like that.

"Q. You beat them because you got fired up, because you were drunk?

"A. No, I didn't beat the kids.

"Q. Because you were drinking. You didn't beat them with this?

"A. I didn't beat them with that.

"Q. You beat them with this?

"A. No, I didn't.

"Q. *Yes, you did.*

"A. No, I didn't.

"Q. You beat the child unconscious?

"A. I didn't beat the child at all.

"Q. Unconscious, a five year old child?

*State* v. *Ferrone,* supra. The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence; *United States* v. *Modica,* supra, 1178–79; which the jury may infer to have precipitated the personal opinions.

### COMMENT ON FACTS NOT IN EVIDENCE

A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. *State* v. *Binet,* 192 Conn. 618, 631, 473 A.2d 1200 (1984); *State* v. *Ferrone,* supra, 169. Statements as to facts which have not been proven amount to unsworn testimony that is not the subject of proper closing argument. ABA Standards, supra, § 3-5.8 (a). It is improper for a prosecutor to use prior oral inconsistent statements substantively. *State* v. *Ruiz,* 202 Conn. 316, 329, 521 A.2d 1025 (1987). Nonetheless, during closing argument the assistant state's attorney in this case referred

---

"A. Didn't beat the child.
"Q. What did you have against that child?
"A. I love all those kids. .
"Q. *What did you have against that child?*
"A. I don't have nothing against none of them. I didn't beat him.
"Q. *Why did you pick him out to beat him?*
"A. I didn't beat him.
"Q. *Why did you pick him out?*
"A. I didn't beat him.
"Q. *Why did you pick him out?*
"A. I didn't beat him.
"Q. *Why didn't you like him?*
"A. I loved him." (Emphasis added.)

A sample of improper comments during closing argument is as follows: "But nobody is ever, ever going to explain this crime; a five year old little boy, defenseless and innocent, hiding under a chair while this savage beat him unconscious, put him in a coma—in a coma.

"We have such nice words for these crimes now. Child-abuser; child abuser. Abuse? Abuse? That's what we do to alcohol. We abuse alcohol. That's not graphic enough a term. *Baby-beater,* that's what they ought to call this. *Infant-thrasher, baby-beater. The more disgusting a term, the better it fits this crime.* A child-abuser? 'Oh, isn't that nice. He's a child-abuser. We'll have to treat him.' *He's an infant-beater; he's a baby-beater."* (Emphasis added.)

to statements introduced only for the limited purpose of impeaching the key defense witness as if they were substantive evidence. The testimony of Weisner concerning the details of a history she had taken from Carrie Payne pursuant to Walter's admission had been introduced only to impeach Carrie Payne's testimony. It was only that testimony which described the defendant beating Walter while he was under a chair. Portions of that testimony, however, were repeatedly and graphically presented to the jury in closing argument as substantive evidence.[8]

## APPEAL TO EMOTION

A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. *United States* v. *Modica,* supra, 1181; *State* v. *Couture,* supra, 564; *State* v. *Carr,* 172 Conn. 458, 470, 374 A.2d 1107 (1977); *State* v. *Ferrone,* supra; ABA Standards, supra, § 3-5.8 (c). We have stated that such appeals should be avoided because they " 'have the effect of diverting the jury's attention from their duty to decide the case on the evidence.' " *State* v. *Couture,* supra, 562. An appeal to emotions may arise directly, or indirectly from the use of personal and degrading epithets to describe the defendant. *Hall* v. *United States,* 419 F.2d 582, 587 (5th Cir. 1969); see *State* v. *Couture,* supra. Although a state's attorney may argue that the evidence proves the defendant guilty, he may not stigmatize the defend-

---

[8] A sample of the assistant state's attorney's improper argument in this regard is as follows: "Imagine the fears of Walter Payne. When you're deciding who to believe and when you're deciding whether this is a serious case or not, *remember the image that's haunted me throughout this case, the image of that little baby hiding under a chair while this man pursued him all around the apartment and beat him; beat him not only unmercifully—because this man doesn't have an ounce of mercy or decency in his whole body*—beat him to the point where that little baby, that little defenseless little boy, couldn't even talk, couldn't even cry, was unconscious where he couldn't even help himself. Think of that when you decide this case."(Emphasis added.)

ant by the use of epithets which characterize him as guilty before an adjudication of guilt. *State* v. *Couture,* supra. When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. See *State* v. *Couture,* supra; ABA Standards, supra, § 3-5.8 (c), commentary. "No trial—civil or criminal—should be decided upon the basis of the jurors' emotions." *United States* v. *Modica,* supra, 1180.

In this case, the prosecutor repeatedly engaged in character assassination and personal attacks on both the defendant and his key witness, Carrie Payne. During cross-examination of the defendant, the assistant state's attorney repeatedly and directly called the defendant a "coward,"[9] and characterized him as "hiding like a dog" when the police discovered him lying in the grass. In his closing argument, the assistant state's attorney, at various times, referred to the defendant as a "child-beater," "baby-beater" and "infant-thrasher." See footnote 8, supra. Additionally, he referred to the defendant as a "liar," "drunken drug-user, convicted felon, child beater," "stupid," "savage child beater," "drunken bum," "evil man," and "a

---

[9] A sample of improper cross-examination is as follows:

"Q. And you got so loaded and so fired up that when Walter did something, that set you off, didn't it?

"A. Walter—

"Q. *And you beat him to a miserable pulp?*

"A. I didn't beat him.

"Q. *You beat him to a miserable pulp. You beat him.*

"A. No, I didn't beat him.

"Q. *You beat him.*

"A. No, I didn't beat him.

"Q. *You coward.*

"A. No, I didn't beat him.

"Q. *You coward.*

"A voice: This is disgusting.

"Mr. Sturman: Your Honor, I'm going to object." (Emphasis added.)

drunk who uses cocaine and smokes marijuana and beats children."[10]

During cross-examination, Carrie Payne was repeatedly characterized as a "liar," as "selfish" and as "nuts." See footnote 7, supra. Additionally, the assistant state's attorney made comments during the cross-examination which, while not explicitly degrading, implicitly carried overtones which can only be characterized as gratuitous character assassination.[11] During closing argument, he referred to Carrie Payne as a "liar," "stupid," an "evil woman," and an "evil, terrible woman." It is reasonably possible that this continuous use of invective would have the improper effect of appealing to the emotions and prejudices of the jury. This is particularly likely since the assistant state's attorney in closing argument encouraged the jury to consider its emotions when rendering its decision.[12]

## Injection of Extraneous Matters

Finally, a prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. ABA Standards, supra, § 3-5.8. It is improper for the prosecutor to encourage the jury to identify with the victim and to predict the effect of a not guilty verdict on him. See *Hawthorne* v. *United States*, supra, 172. Nor can the

[10] A sample of improper closing argument is as follows: "But nobody is ever, ever going to explain this crime; a five year old little boy, defenseless and innocent, hiding under a chair while *this savage* beat him unconscious, put him in a coma—in a coma." (Emphasis added.)

[11] Samples of these statements on cross-examination are: "You're just bubbling over with motherly love aren't you?"; "You know everything about children, you're such a great mother"; and "Made you look like a fool right off the bat. Can't even give a phone number because you know you don't have a phone, and you know that I know that, too."

[12] The assistant state's attorney stated in closing argument: "You took an oath to be fair here. There's a lot of emotion involved in this case. There's no way you can get around it. Sometimes, that emotion can heighten your senses, can give you wisdom you normally don't have."

prosecutor imply to the jury that a not guilty verdict will make it responsible for the defendant's future conduct. *State* v. *Gold,* 180 Conn. 619, 659, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). We have stated that "[a] defendant is on trial for what has been done and not for what he or she might do." Id. Nonetheless, the assistant state's attorney in this case repeatedly made comments during closing argument beseeching the jury to protect the victim and other children from the future conduct of the defendant.[13]

We have carefully examined the entire record of this case. The course of prosecutorial misconduct was not invited by any conduct or argument of the defendant. Cf. *State* v. *Fullwood,* supra. It was severe; *State* v. *Couture,* supra; and frequent. Cf. *State* v. *Doehrer,* supra; *State* v. *Palmer,* supra. It bore directly on the critical issues of the credibility of the defendant and

---

[13] Samples of improper closing argument are as follows: "The focus of this case should be this little boy whose picture you have here who's somewhere in New Haven now with that mother. Make believe that he's sitting right here and relying on you . . . ."

"We're here to see that the law is upheld. In that way, a totally defenseless and innocent person like Walter Payne is protected.

"How is he protected? He's protected by people just like you being fair, by using your common sense, your knowledge of everyday happenings, the experiences that you've learned and lived in your life, to judge the testimony you've heard here.

\* \* \*

"All you need here is common sense. God knows you saw enough of that woman. You should know what she's trying to do here. This is the guy that she's married to. They're like bookends; they deserve each other. The kids don't deserve these people. Walter Payne is an innocent person. He deserves to be protected.

\* \* \*

"Remember what's at stake here, ladies and gentlemen. Remember who the victim is here. Remember what your job is. Without you to protect people like Walter Payne, we'd have no laws.

"Do your job fairly. Do your job well. Protect Walter Payne and convict this man."

Carrie Payne, and on the defendant's guilt or innocence. *Hawthorne* v. *United States,* supra. The curative measures employed by the court, which consisted of occasional directions to the jury to disregard the remarks of the assistant state's attorney and of brief passages in the jury charge,[14] were insufficient to eliminate the accumulated harm created by the course of prosecutorial misconduct. Because of the severity and frequency of the misconduct, this is not a situation where we can safely rely on the presumption that the jury will follow the court's instructions.

In this connection, we recognize that primarily it is the responsibility of the defense counsel to protect the rights of his client by taking appropriate action to alert the trial court to claims that those rights are being jeopardized. In this case, the defense counsel's sporadic objections to the improper cross-examinations and his lack of objection to the impermissible closing argument fell short of that responsibility. Nonetheless, in a case of serious and repeated prosecutorial misconduct such as this, the trial court has an independent responsibility to intervene, even in the absence of an objection or motion by defense counsel. See *Harris* v. *United States,* supra, 657. Although the timing and degree of that intervention will depend upon the facts of each case; id., 657 n.1; the court's reaction should be proportionate to the seriousness of the misconduct. *Berger* v. *United States,* supra, 85; *Harris* v. *United States,* supra.

---

[14] The court charged, for example, as follows: "I know that you realize that opinions expressed by the lawyers are not binding upon you. You should look to the attorneys' closing arguments, of course, for guidance and assistance in performing your function, but their arguments are their own views of evidence and witnesses and so on, and need not be yours."

The court also charged: "Similarly, any sympathy for Mr. Williams or any other person in the case should not affect your consideration. The jury must make a cold and rational decision on the facts and not be affected by emotional considerations, such as sympathy for the child or the mother or Mr. Williams, or anyone else involved in the case."

We cannot say that the court's cautions to the jury in this case adequately dealt with the severity of the prosecutorial misconduct.

Nor is this a case in which the state's evidence was so strong that we can say that there was harmless error. Although much of the circumstantial evidence pointed strongly toward the defendant, the failure of Damon Payne to inculpate the defendant at trial, coupled with the testimony of the defendant and of Carrie Payne, made the credibility of the defendant and of Carrie Payne critical issues in the case. Indeed, the assistant state's attorney argued as much to the jury. We conclude that, on the facts of this case, the defendant was denied a fair trial in violation of his federal and state constitutional rights to due process of law.

The defendant claims constitutional protection under the due process clause of the fourteenth amendment to the United States constitution, as well as under the Connecticut constitution, article first, § 8. The defendant's right to be convicted only after a fair trial free of pervasive prosecutorial misconduct has independent significance under the due process clause of the state constitution. *State* v. *Couture,* supra, 564. Our decision today, therefore, rests not only on the mandates of the federal constitution, but also on independent and adequate state grounds. Conn. Const., art. I, § 8; see *Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983).

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other justices concurred.