STATE OF CONNECTICUT *v.* ALBERT RUPAR
(AC 24202)

Schaller, Bishop and Mihalakos, Js.

Argued September 14—officially released December 28, 2004

*Richard W. Callahan*, special public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Elizabeth C. Leaming*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Albert Rupar, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that the prosecutor committed misconduct that resulted in a denial of the defendant's due process rights to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 14, 2001, the defendant attended a party at the seven year old victim's home.[1] The defendant,

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom her identity may be ascertained. See General Statutes § 54-86e.

along with several other adults in attendance at the party, gave rides to children on his all-terrain vehicle around the seven acre property. The victim rode with the defendant a number of times throughout the evening, sometimes sitting on the back of the vehicle, behind the defendant, and sometimes sitting toward the front of the vehicle, between the defendant's legs. Every time the victim rode with the defendant, except for the first time, the defendant, using his left hand, touched her vagina both over and under her clothes. On the final ride, the defendant inserted his finger into her vagina. The defendant warned her not to tell anyone what had happened.

Despite the defendant's warning, the victim immediately told her mother that the defendant had "hugged her privates." After her mother questioned her, the victim then revealed that the defendant had touched her both over and under her clothes, and that the defendant had inserted his finger into her vagina. The victim's mother consulted with the victim's father, and the two called the police. Shortly thereafter, the police arrived at the victim's home. The victim was brought to the police station and interviewed. Late that evening, on July 15, 2001, the state police arrested the defendant at his home.

By substitute information, the defendant was charged with sexual assault in the first degree, sexual assault in the fourth degree and risk of injury to a child. The defendant's trial began on December 3, 2002. On December 10, 2002, the jury convicted the defendant of sexual assault in the fourth degree and risk of injury to a child. The defendant was acquitted of sexual assault in the first degree. On February 21, 2003, the court sentenced the defendant to a total term of eleven years incarceration, execution suspended after seven years, with twenty years probation. As a special condition of his probation, the defendant was ordered to register as a

sex offender for ten years. This appeal followed. Additional facts will be set forth as necessary.

The defendant claims that his federal and state due process rights to a fair trial were violated as a result of numerous instances of prosecutorial misconduct. Specifically, the defendant claims that (1) the use of testimony by the appointed guardian ad litem improperly bolstered the victim's credibility, (2) the prosecutor, acting prior to the court's ruling on admissibility and in disregard of a court order, informed the jury of prejudicial, prior uncharged conduct, (3) in her closing argument, the prosecutor improperly commented on the defendant's failure to testify and improperly suggested that the state was subject to a lower burden of proof, (4) the prosecutor improperly introduced prejudicial matters to the jury by suggesting that the defendant was being investigated by the department of children and families (department) and that the defendant's lineage consisted of other child abusers, and (5) the prosecutor, by using only a small percentage of her allotted time for her closing argument and making a more substantial argument during her final closing argument, denied the defendant his right to rebut the state's main argument regarding the victim's credibility.

We must first set forth the applicable standard of review. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 245–46, 833 A.2d 363 (2003). In other words, "[i]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole." (Internal quotation

marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 376, 832 A.2d 14 (2003).

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003).

In cases in which incidents of alleged prosecutorial misconduct were not objected to at trial, this court must apply the factors set out by our Supreme Court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). See *State* v. *Stevenson*, 269 Conn. 563, 572–76, 849 A.2d 626 (2004).[2] "[A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial." *State* v. *Stevenson*, supra, 573. "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among

[2] The defendant concedes that his prosecutorial misconduct claim is unpreserved and seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Our Supreme Court, however, recently held that it is not necessary for a defendant to prevail under the specific requirements of *Golding* in these circumstances. *State* v. *Stevenson*, supra, 269 Conn. 572–73. In reviewing claims of prosecutorial misconduct, regardless of whether the defendant objected at trial to the incidents of misconduct, the court must look at the specific prosecutorial misconduct factors articulated in *State* v. *Williams*, supra, 204 Conn. 540. *State* v. *Stevenson*, supra, 573.

them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 540. In addition, defense counsel's failure to "object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial . . . ." *State* v. *Stevenson*, supra, 576.

I

We begin our analysis by first determining whether the prosecutor engaged in misconduct. The defendant's brief provides analysis of five instances of alleged misconduct. We will address each alleged act of misconduct in turn.

A

Guardian Ad Litem Testimony

First, the defendant contends that the prosecutor called the victim's guardian ad litem to the witness stand and elicited improper testimony from her regarding the victim's veracity. The defendant asserts that the testimony was particularly damaging because the credibility of the victim was the ultimate issue. Moreover, the defendant claims that by eliciting testimony from the guardian ad litem regarding her appointment by the court, the prosecutor "shrouded the guardian ad litem with the authority and influence of the court . . . ." Although the testimony of the guardian ad litem may have been improper, we conclude that it did not deprive the defendant of a fair trial.

In this case, the prosecutor called the guardian ad litem to the witness stand and asked her several questions regarding the victim's competency. The prosecutor asked the guardian ad litem to explain her role and to describe her first meeting with the victim. Testifying about her role, the guardian ad litem stated that she "always talk[s] about . . . the seriousness of a case at hand so that [she] can get into the conversation as to whether or not the child really understands what it would mean to be telling the truth, what it would mean if they weren't sure of something, things like that." The prosecutor then asked if the guardian assessed the victim's ability to tell the truth. When the guardian answered that she had, the prosecutor asked a follow-up: "Did she seem to understand the distinction?" The guardian answered: "Oh, quite clearly she did. She knows that when you tell a lie, there are consequences, and we talked about those consequences in a couple of scenarios: in the school scenario, in the home scenario. . . . You know, how . . . what would happen if you told mom a lie? What would happen if you told dad a lie? You know, what would happen if you told your friend a lie? Things like that." After the guardian ad litem described her meeting with the victim, the prosecutor asked the guardian ad litem if she believed that the victim was capable of coming to court. The guardian ad litem replied: "Yes, I did. She appeared to be very strong. She appeared to be a real independent thinker. She appeared to be relatively untarnished."

Here, the guardian ad litem discussed her assessment of the child's ability to appreciate the difference between the truth and a lie, focusing more on the child's competency than on her credibility.[3] Nevertheless, a

[3] A guardian ad litem assesses the best interests of a child on an individual basis. There are no clear standards for defining the role of the guardian ad litem, particularly in situations in which the guardian works with victims who testify in criminal trials. Generally, however, a guardian ad litem is not called as an expert witness, but is used as an advocate for children. Nevertheless, we recognize that the guardian ad litem's testimony may raise

child witness is presumed to be competent. See General Statutes § 54-86h. Moreover, there was no objection to the victim's competency when the victim was called to testify. The guardian ad litem's testimony, therefore, even though it concerned competency issues, appeared to bolster the victim's credibility. It is a "well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity . . . [and that] [a]s a matter of law, [t]he credibility of witnesses is exclusively for the determination by the jury . . . . " (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 706–707, 793 A.2d 226 (2002). Consequently, that testimony, which impliedly bolstered the victim's credibility, was improper.

The guardian ad litem's testimony, however, did not constitute a violation sufficient to deprive the defendant

issues similar to those created when an expert testifies about the credibility of a witness.

Our Supreme Court has recognized that "when credibility is in issue, the risk that jurors will abdicate their responsibility to assess the victim's credibility by inferring that an examining psychologist believed the patient is too apparent to pass off as minimal. . . . It, therefore, is especially important in child sexual abuse cases that the trial court remain committed to ensuring that the jury is not tainted by improper expert testimony regarding the credibility of the child victim." (Citation omitted; internal quotation marks omitted.) *State* v. *Grenier*, 257 Conn. 797, 809–10 n.14, 778 A.2d 159 (2001). "In cases that involve allegations of sexual abuse of children, our Supreme Court has held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify further to her opinion of whether a victim in a particular case is credible or that a particular victim's claims are truthful." (Citations omitted; internal quotation marks omitted.) *State* v. *Grenier*, 55 Conn. App. 630, 640, 739 A.2d 751 (1999), rev'd on other grounds, 257 Conn. 797, 778 A.2d 159 (2001).

Nevertheless, in this case, the guardian ad litem provided merely her assessment of the child's ability to appreciate the difference between right and wrong. She did not express her opinion as to whether she believed the victim's story was true.

of his due process right to a fair trial.[4] First, there was no objection to the guardian ad litem's testimony. Although "counsel's failure to object at trial, [is] not by itself fatal to a defendant's claim, frequently [it] will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . ." (Internal quotation marks omitted.) *State* v. *Stevenson,* supra, 269 Conn. 576. Second, the record suggests that the misconduct was invited by the defendant because defense counsel asked the victim what she had told the guardian ad litem and about her ability to tell the truth. Furthermore, the conduct was neither frequent nor severe because the guardian ad litem was only one witness out of many who testified at trial, and her testimony was not objected to at trial. Finally, even though there were no curative instructions given to the jury regarding the guardian ad litem's testimony, such instructions were not requested by the defendant. We conclude, therefore, in light of our due process analysis, that the guardian ad litem's testimony did not deprive the defendant of a fair trial.

B

Introduction of Evidence Prior to Court's Ruling

The defendant's second claim focuses on the testimony of the investigating police officer regarding the department. The defendant contends that on redirect examination, the state violated a court order, which was dated December 3, 2002. The defendant, however, misstates the contents of the state's motion in limine and the substance of the court's order. The state, in its motion in limine, which was filed on November 25, 2002, argued that the defendant should be precluded from eliciting testimony regarding the involvement of

---

[4] We are mindful of our Supreme Court's recent decision that guides our prosecutorial misconduct analysis. See *State* v. *Stevenson,* supra, 269 Conn. 563.

the department with two potential witnesses who were to testify about prior misconduct. The court, in addressing the motion, stated that it would defer its ruling on the introduction of evidence concerning uncharged misconduct. No order was ever issued by the court amounting to a complete prohibition on all evidence concerning the department.

Although there were two other included provisions in the motion, only the two provisions pertaining to juvenile witnesses were postponed. Before the court ruled on the remaining portions of the motion, relating to the witnesses' involvement with the department, the prosecution, in its questioning of the investigating officer, asked about the department's involvement in sex abuse cases. When the prosecutor asked the officer why the police did not refer the victim to Saint Francis Hospital and Medical Center after determining that the local hospital could not examine the child, the officer explained that referrals to out of area hospitals are ordinarily set up by the department. The prosecutor asked a series of follow up questions:

"[The Prosecutor]: Was [the department] involved in this particular case?

"[The Witness]: I—I involved them.

"[The Prosecutor]: I'm sorry?

"[The Witness]: I got them involved, yes.

"[The Prosecutor]: How were they involved?

"[The Witness]: I made the report to [the department].

"[The Prosecutor]: Through the hotline?

"[The Witness]: Through the hotline, followed up by a contact with the Willimantic office.

"[The Prosecutor]: And was there—did they accept the case in that they were going to investigate it further at their end?

"[The Witness]: Initially, ma'am? No, they didn't because the [defendant] was not a family member or a member of the household, and that doesn't qualify under [the department's] guidelines.

"[The Prosecutor]: To accept the—to open a file on a particular case.

"[The Witness]: Exactly.

"[The Prosecutor]: So, they never opened a file on the [victim's] family.

"[The Witness]: They opened one later on.

"[The Prosecutor]: For what purpose?

"[The Witness]: When I spoke to the Willimantic office, they felt it might be appropriate to open a case, and I believe, more or less, they were looking at his grandchildren rather than the [victim's] family."

The defendant, in his brief, correctly points out that a purposeful violation of a court order may constitute misconduct. That principle, however, is inapplicable to this case because there was no court order to be violated. Moreover, the prosecutor did not appear to have elicited purposefully the statement to which the defendant objects most vehemently. In fact, the prosecutor asked if the department had opened a file on the victim's family. The police officer explained that a file had not been opened on the victim's family, but that one had been opened on another family and stated that the department was looking at "his grandchildren . . . ." The prosecutor did not follow-up on any details related to that statement and the defense did not object. We conclude, therefore, that the questioning of the investi-

gating officer did not constitute prosecutorial misconduct.

## C

### Improper Comment on the Failure to Testify

The defendant's third argument focuses on the prosecutor's comments, in her closing argument, which referred to sexual assault cases as situations in which the credibility of the witness becomes the most important evidence. During the state's final closing argument, the prosecutor stated: "Sexual assault of children is generally not committed in front of an audience. Safe to say? Would it make sense that somebody would molest a child in view of several people so that they could then run off to the police and tell what they saw? As a result, a victim's word—it's often a victim's word against a defendant's word as to what occurred." The defendant contends that those comments amounted to an improper comment on his failure to testify and improperly diluted the state's burden of proof. We disagree.

"[T]he Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). "Our legislature has given statutory recognition to this [fifth amendment] right by virtue of its enactment of . . . [General Statutes] § 54-84. In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in

which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Even an indirect remark by the prosecuting attorney may violate a defendant's privilege against self-incrimination if it draws the jury's attention to the failure of the accused to testify." (Citation omitted; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 270.

In this case, the prosecutor's statement was made after the defense presented its closing argument, which included extensive attacks on the victim's credibility and her memory of events. Much of the defendant's argument included an analysis of whether the events could have happened in the way they were described by the victim and the suggestion that such an assault would never happen in close proximity to others. The prosecutor's final closing argument sought to address the defendant's suggestions and to urge the jury to rely on the evidence presented. We conclude that there is nothing to suggest that a statement that explains that sexual assault cases are often decided on the credibility of the victim or the defendant is intended as a comment on the defendant's failure to testify. There was no violation of the defendant's fifth amendment right, and the prosecutor's statements did not constitute misconduct.

## D

### Injection of Highly Prejudicial Extraneous Matters

The defendant's fourth contention is that the prosecutor interjected two highly prejudicial matters into the minds of the jurors, appealing to their emotions, passions and preconceived notions to affect the defendant's right to a fair and impartial jury. The defendant

contends that the prosecutor's questioning of the investigating officer regarding the department's involvement in sexual assault cases suggested to the jury that the defendant had been accused of sexual assault prior to this case. Also, the defendant argues that the prosecutor's questions directed to the defendant's brother, regarding the brother's alleged apology to the victim's father, implied that the defendant had other sex offenders in his family. The defendant submits that the introduction of those two pieces of evidence suggested to the jury that the defendant, himself, had a history of committing such abuse and that he was more likely to have committed this crime because his father had been a sex offender. We conclude that neither statement interfered with the defendant's right to a fair and impartial jury.

"It is the prosecutor's duty to see that justice is done and to use any legitimate means to accomplish that, including persuading the jury that its verdict will accord with justice." *State* v. *Yusuf*, 70 Conn. App. 594, 632, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002). Nevertheless, "[a] prosecutor . . . may not appeal to the emotions, passions and prejudices of the jurors . . . or otherwise inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 248.

We already have addressed the prosecutor's questioning of the investigating police officer regarding the involvement of the department and concluded that the examination of that witness did not result in misconduct. See part I A 2. Similarly, we conclude that the prosecutor's questions about the alleged apology of the defendant's brother did not divert the jury from its duty to decide the case. During cross-examination of the defendant's brother, the prosecutor asked if he had

apologized to the victim's father for the defendant's behavior. When the witness explained that he could not recall, the prosecutor followed-up by asking, "You don't recall saying to [the victim's father], I'm sorry; I'm not from the same seed as my brother?" The witness told the prosecutor several times that he never made such an apology. The prosecutor asked again whether the defendant's brother had told the victim's father that he "was not from the same seed as [his] brother." Although the prosecutor asked about the alleged apology more than once, the alleged statement was vague. There is nothing to indicate that a reasonable juror would infer from that question that the defendant's father also was a sex offender, thereby unduly influencing the jury.

### E

### Closing Argument

The defendant's final claim of prosecutorial misconduct focuses on the state's decision to use the majority of its allotted time for closing argument in its final closing argument. On December 10, 2002, the state began its closing argument. The state's brief argument focused on explaining to the jury the elements of each count with which the defendant was charged. The defense then presented its closing argument. Then, the state made its final closing argument. See Practice Book § 42-35 (4). During final closing argument, the prosecutor discussed the details of the case. By doing that, the defendant claims that the defense had little to which it could respond. In other words, because the state discussed in its initial closing argument only the elements of the crimes charged, the defendant claims that he was unable to rebut effectively the state's closing argument. The defendant admits, however, that there is no law on the issue.

"[P]rosecutorial misconduct of constitutional proportions may arise during the course of closing argument,

thereby implicating the fundamental fairness of the trial itself . . . ." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 583. "[T]he role of closing argument [is] intended to help [the jury] interpret the evidence . . . . The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Pereira*, 72 Conn. App. 545, 569, 805 A.2d 787 (2002), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003). "We previously have observed that because closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Nevertheless, [w]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Williams*, 81 Conn. App. 1, 5–6, 838 A.2d 214, cert. denied, 268 Conn. 904, 845 A.2d 409 (2004).

We conclude that there is nothing improper in the state's use of its time for closing arguments. The defendant has failed to provide us with any statute, case law or rule of practice regarding the use of time in closing arguments. There is nothing to suggest that a closing argument must be made in a particular order or that the state's initial argument should contain the majority of its argument. Closing arguments must be fair and based on evidence. In all likelihood, defense counsel had anticipated the state's arguments and prepared his argument in advance. In addition, the defendant does not claim that the substance of the state's closing argu-

ment was improper. We therefore must permit the state wide latitude in its decision to make the substantive portion of its closing argument during final closing argument and conclude that the state's closing argument did not constitute misconduct.

## II

Having resolved that the defendant's last four claims do not constitute misconduct, we need not address the *Williams*[5] factors. There was no misconduct that could have denied the defendant his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] Those factors were enumerated in our discussion of our standard of review. See part I.