STATE OF CONNECTICUT *v.* RONALD SCHIAVO
(AC 24267)

Dranginis, DiPentima and Mihalakos, Js.

Argued October 18, 2005—officially released January 24, 2006

*Nancy H. Van der Veer*, certified legal intern, with whom were *Timothy H. Everett*, special public defender, *Todd D. Fernow*, special public defender, and, on the brief, *Erin K. Desmarais*, *Michael A. Leone*, *Elizabeth Festa*, *Stephen O. Clancy* and *Stefan J. Van Jura*, certified legal interns, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin A. Lipsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Ronald Schiavo, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a). On appeal, the defendant claims that (1) the jury charge was improper and (2) he was deprived of a fair trial due to prosecutorial misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In early January, 2000, the defendant was living with Roland Collier and Arlinn Collier. They lived in the first floor apartment of a two floor apartment house located at 24 Wall Street in Waterbury.[1] A friend of the

---

[1] The second floor apartment was numbered 26 Wall Street.

Colliers, Jennifer Young, introduced the Colliers to the victim, Jomol Graham, for the purpose of purchasing drugs. On the afternoon of January 28, 2000, the defendant drove the Colliers to Ansonia so that Roland Collier could purchase drugs from Graham. Roland Collier was, however, unable to make the purchase. In the early morning hours of January 29, 2000, the defendant and the Colliers decided to break into Graham's car and steal the drugs that they knew were kept in the trunk of the car. The defendant took a jacket, sneakers and a briefcase from Graham's car and then drove back to the Colliers' apartment. The briefcase contained approximately $2000 in cash and approximately two ounces of cocaine. Roland Collier and the defendant divided the cocaine and cash between themselves, and then the Colliers and the defendant smoked cocaine for the next few hours. As the morning progressed, the three became increasingly worried about their actions and possible repercussions from Graham. Concerned for their safety, the defendant tossed the items they had stolen from Graham's car over the fence into the next yard, and he and the Colliers went upstairs to the second floor apartment where Roland Collier's sister, Carla Barbera, lived. The defendant and the Colliers sat around Barbera's kitchen table using cocaine. At some point during that time, the defendant removed a .38 caliber handgun from his pants pocket and placed it on the kitchen table.

Meanwhile, Graham had discovered that his car had been broken into and that items were stolen. Suspecting that Roland Collier had broken into his car, Graham went to see Young, who offered to give him a ride to Waterbury. At approximately 8:30 a.m., the two arrived in Waterbury. They spoke to the Colliers' neighbor, Theresa Morin, and asked her if she knew where the owner of the car parked in front of 26 Wall Street was

at that time.[2] Morin pointed to 26 Wall Street and replied that the owner, Roland Collier, was either at home or at a store. Young went to move her car, and Graham walked across the street and entered Roland Collier's apartment. Young joined Graham, and together they searched for Graham's possessions in the Colliers' apartment. Unsuccessful, they left the apartment and went back to Young's car. Recalling that Roland Collier's sister resided in the second floor apartment, Young went back into the house. Young knocked on Barbera's door, which opened into the kitchen.

After hearing Young knocking on the door, the Colliers ran and hid in another room. The defendant grabbed his handgun and stayed in the kitchen out of sight. Barbera opened the door and after a brief exchange, Young returned to her car and told Graham that Roland Collier was not in either apartment. Graham decided to speak to Barbera directly. The Colliers continued to hide in Barbera's apartment, and the defendant maintained his position in the kitchen. Barbera's apartment door was still open following her exchange with Young. Graham stuck his head and part of his body in through the opening of the door. As he looked through the opening of the door, the defendant immediately shot him in the forehead. Barbera asked the defendant why he had shot the victim, to which the defendant replied, "I don't know." The defendant then cleaned the drug paraphernalia off the kitchen table and left the second floor apartment with the Colliers. The Colliers and the defendant left the apartment in the defendant's car. As the defendant was driving away, he pointed his handgun in Young's direction.

The defendant and the Colliers traveled together to Maine and then to New York and eventually went to Florida, where the defendant was apprehended. The

---

[2] See footnote 1.

handgun that the defendant used in the shooting was recovered in Maine. Graham died from the gunshot wound two days after being shot by the defendant. The defendant was arrested and charged with murder in violation of General Statutes § 53a-54a (a). On October 1, 2001, a mistrial was declared after a jury of twelve was unable to reach a verdict. On September 4, 2002, a second jury trial was conducted. The jury found the defendant not guilty of murder, but guilty on the lesser included offense of intentional manslaughter in the first degree with a firearm, in violation of § 53a-55a (a). The court sentenced the defendant to forty years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The primary focus of the defendant's first claim is that the jury was misled by the court's instruction on self-defense. More particularly, the defendant claims that the court improperly instructed the jury on the (1) return of property exception to self-defense and (2) duty to retreat exception to self-defense.[3] We disagree.

Because the defendant did not preserve either claim for appeal, he requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), for both of his claims.[4] Finding the first two *Golding* prongs

---

[3] General Statutes § 53a-19 (b) provides: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform."

[4] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged

satisfied with regard to the defendant's first claim of instructional error, we will review that claim under *Golding*. We decline, however, to provide *Golding* review for the defendant's second claim of instructional error for reasons we will discuss.[5]

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 490, 820 A.2d 1024 (2003). We will address each of the defendant's claims regarding the court's instruction to the jury on self-defense in turn.

A

The defendant first claims that the court's instruction on the return of property exception to self-defense was misleading. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. At trial, the defen-

---

constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[5] See part I B.

dant admitted shooting Graham, but claimed that he had acted in self-defense. Both the state and the defendant submitted requests to charge on the issue of self-defense. The defendant, however, later withdrew his request to charge on the return of property exception to self-defense.[6] The court gave the jury a lengthy charge on self-defense, which included the following instruction addressing the return of property exception to self-defense. "There is another circumstance that makes the use of deadly force unjustified. If the assailant's—in this case, it's Mr. Jomol Graham—conduct appears motivated by his claim to property that the defendant possesses and the defendant . . . knows that if he surrendered the property that the assailant, Jomol Graham, *would* flee without harming him, then the defendant . . . may not use deadly force—must—must surrender the property." (Emphasis added.) Later, when the court summarized its charge in relation to self-defense, it charged that if the state had proved beyond a reasonable doubt that the defendant knew that Graham *could* flee without harming the defendant, then the defendant was not justified in using deadly force. The defendant did not take an exception to the court's charge or request a curative instruction.

"Due process requires that a defendant charged with a crime must be afforded the opportunity to establish a defense. . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified." (Internal quotation marks omitted.) *State* v. *Morgan*, 86 Conn. App. 196, 202–203, 860 A.2d 1239 (2004), cert. denied, 273 Conn. 902, 868 A.2d 746 (2005). It is well established that "[t]he test to be applied to any part of a charge is

[6] Both the state and the defendant also submitted supplemental requests to charge on the issue of self-defense.

whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) Id., 203.

After careful review of the charge in its entirety, we are satisfied that it was not reasonably possible that the jury was misled by the court's instruction. Although the court inadvertently substituted the word "could" for "would" in its summary to the jury, it used the correct language when giving its lengthy charge to the jury. "We have recognized that when a court gives a lengthy jury instruction, a slip of the tongue may occasionally occur." (Internal quotation marks omitted.) *State* v. *Serrano*, 91 Conn. App. 227, 245, 880 A.2d 183, cert. denied, 276 Conn. 908, 884 A.2d 1029 (2005). In this instance, the jury was given proper guidance regarding the return of property exception to self-defense, despite the court's slip of the tongue. Moreover, we are cognizant of the absence of any objection to the charge made on behalf of the defendant.

"Where counsel . . . seeks to raise on appeal a potential defect in the jury charge which he did not raise at trial, his silence at trial is a powerful signal that, because of the posture of the case, he did not hear the defect in the harmful manner which he presses on appeal, or even if he did so hear it, he did not deem it harmful enough to press in the trial court. When the principal participant in the trial whose function it is to protect the rights of his client does not deem an issue harmful enough to press in the trial court, the appellate claim that the same issue clearly deprived the defendant of a fundamental constitutional right and a fair trial . . . is seriously undercut." (Internal quotation marks omitted.) *State* v. *Diaz*, 86 Conn. App. 244, 254, 860 A.2d 791 (2004), cert. denied, 273 Conn. 908, 870 A.2d

1081 (2005). Although we do not suggest that this princi-
ple negates the defendant's right to *Golding* review, in
this instance it supports the state's proposition that the
court's slip of the tongue did not violate the defendant's
constitutional rights. We therefore conclude that the
defendant clearly was not denied his constitutional right
to a fair trial. Accordingly, the defendant's claim fails
under the third prong of *Golding*.

## B

The defendant next claims that the court improperly
instructed the jury regarding the duty to retreat excep-
tion to self-defense and that he is entitled to *Golding*
review of that unpreserved claim. We disagree that the
defendant is entitled to *Golding* review.

The defendant filed two written requests to charge
on self-defense. In one of those requests, the defendant
included language on the duty to retreat exception to
self-defense. Within its charge to the jury, the court
included an instruction on the duty to retreat, as
requested. The defendant did not take an exception to
the court's charge or request a curative instruction. On
appeal, the defendant claims that the court should have
added additional instructions to its charge to the jury
relating to that exception. Specifically, the defendant
claims that the defense of use of physical force in
defense of premises would not require retreat "if the
jury found that the defendant was a social guest of the
dweller and that his attacker was neither a codweller
nor a social guest." The defendant concedes that he
did not preserve his claim because he failed to request
such a more complete charge and did not take an excep-
tion to the charge given, which he had requested. We
decline to provide *Golding* review for induced error.[7]

---

[7] "An induced error, or invited error, is '[a]n error that a party cannot
complain of on appeal because the party, through conduct, encouraged or
prompted the trial court to make the erroneous ruling.'" *State* v. *Cruz*, 269
Conn. 97, 105 n.8, 848 A.2d 445 (2004).

See *State* v. *Alston*, 272 Conn. 432, 456, 862 A.2d 817 (2005); *State* v. *Gibson*, 270 Conn. 55, 66–67, 850 A.2d 1040 (2004); *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004). By filing a written request to charge with specific language regarding the duty to retreat exception, the defendant essentially induced the court to provide the charge that it did on the duty to retreat.[8] "To allow [a] defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal." (Internal quotation marks omitted.) *State* v. *Cruz*, supra, 106. As our Supreme Court has firmly established, *Golding* review is not available for induced error. *State* v. *Alston*, supra, 456.

## II

The defendant's final claim is that he was deprived of a fair trial due to prosecutorial misconduct during cross-examination and closing argument. Despite making timely objections to the prosecutor's questioning during cross-examination, the defendant did not object to the final argument and did not raise a claim of prosecutorial misconduct at trial and now seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40. We disagree that the defendant was deprived of a fair trial.

We begin by setting forth the applicable standard of review. "Typically, if a defendant fails to preserve a claim for appellate review, we will not review the claim unless the defendant is entitled to review under the

---

[8] We note that "[a] trial court has no independent obligation to instruct, sua sponte, on general principles of law relevant to all issues raised in evidence . . . . Rather, it is the responsibility of the parties to help the court in fashioning an appropriate charge." (Citation omitted; internal quotation marks omitted.) *State* v. *Arena*, 235 Conn. 67, 75, 663 A.2d 972 (1995). "The ever increasing refinement of our law justifies the cooperation of counsel in stating requests for jury instructions . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 212 Conn. 593, 612, 563 A.2d 671 (1989).

plain error doctrine or the rule set forth in *State* v. *Golding*, [supra, 213 Conn. 239–40]. . . . In cases of unpreserved claims of prosecutorial misconduct, however, it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . *Golding* . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out . . . in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . .

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged incidents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in [due process] claims involving prosecutorial misconduct, therefore, is . . . only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis, and the

specific *Golding* test, therefore, is superfluous. In light of these observations, we conclude that, following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Spencer*, 275 Conn. 171, 177–79, 881 A.2d 209 (2005).

"In examining claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id., 179.

Only if we conclude that prosecutorial misconduct has occurred do we then determine whether the defendant was deprived of his due process right to a fair trial. In doing so, "we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following *Williams* factors: the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) Id., 180.

## A

The defendant claims that several comments made by the prosecutor during closing argument constituted misconduct. In his brief, the defendant intermingles those claims, arguing that the prosecutor maligned his theory of defense when she improperly appealed to the jury's passions by personalizing her remarks.[9] On the basis of our review of the record, we conclude that the prosecutor did not engage in misconduct.[10]

As we oftentimes have stated, "[c]losing arguments of counsel . . . are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will

[9] The prosecutor began her closing argument with the following challenged remarks: "How do we measure a life? In this case, we know that a life has been taken, the life of Jomol Graham. The defendant tells you that he took his life. No doubt. Yet, he stands here before you, the members of the jury, and asks you to say that it's okay, that it's justified. But we know that it's not okay. And how do we know that? We know it from the evidence. We know it from the lack of evidence. We know it from the things that are said that don't make any sense. We know it from the testimony of the witnesses. And we know it from the things that are disproven by their evidence. And that's really, in sum, what we talked to you about during voir dire as being your job, now, to evaluate all of the different evidence that you have before you."

[10] Included in the defendant's claim of prosecutorial misconduct is the assertion that the prosecutor improperly used the majority of her allotted time for closing argument in her final closing argument. That claim has no merit. "There is nothing to suggest that a closing argument must be made in a particular order or that the state's initial argument should contain the majority of its argument. Closing arguments must be fair and based on evidence. . . . We . . . must permit the state wide latitude in its decision to make the substantive portion of its closing argument during final closing argument . . . . " *State* v. *Rupar*, 86 Conn. App. 641, 656–57, 862 A.2d 352 (2004), cert. denied, 273 Conn. 919, 871 A.2d 1030 (2005).

draw that meaning from the plethora of less damaging interpretations. . . . Therefore, because closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [W]e must review the comments complained of in the context of the entire trial." (Citation omitted; emphasis in original.) *State* v. *Chasse*, 51 Conn. App. 345, 358, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999).

Without citing any supporting precedent, the defendant argues that the prosecutor's remarks were improper and constituted personalized comments that incited the passions of the jury. We disagree. We conclude that the remarks were nothing more than a permissible appeal to the jurors to consider the evidence and to use their common sense when evaluating that evidence. See *State* v. *Lindo*, 75 Conn. App. 408, 416, 816 A.2d 641, cert. denied, 263 Conn. 917, 821 A.2d 771 (2003). Although the opening passage, "[h]ow do we measure a life," could have been phrased more artfully, we recognize that "[t]he occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Bermudez*, 274 Conn. 581, 589, 876 A.2d 1162 (2005). We cannot conclude that the prosecutor's comments in any way diverted the jury's attention from the facts of the case. The comments were not improper and did not constitute prosecutorial misconduct.

## B

The defendant also claims that the prosecutor committed misconduct during cross-examination by asking misleading questions that implied that the defendant was changing his testimony from that given at his first trial. Because we conclude that the defendant could not have suffered any degree of prejudice in these circumstances, we need not decide whether the conduct was improper. See *State* v. *Antonio A.*, 90 Conn. App. 286, 301, 878 A.2d 358, cert. denied, 275 Conn. 926, 883 A.2d 1246 (2005); *State* v. *Goodson*, 84 Conn. App. 786, 799, 856 A.2d 1012, cert. denied, 271 Conn. 941, 861 A.2d 515 (2004); see also *State* v. *Paradise*, 213 Conn. 388, 400, 567 A.2d 1221 (1990).

The following facts are relevant to our resolution of the defendant's claim. The defendant testified in an effort to support his claim of self-defense. During direct examination, defense counsel asked the defendant to explain what he thought was going to happen when Graham entered the second floor apartment, to which the defendant replied that he thought that Graham was reaching for a gun to shoot him. That testimony was consistent with the defendant's testimony at his first trial. In an effort to impeach the defendant, the prosecutor attempted to elicit testimony from the defendant to the effect that he failed to mention, in both his statement to police and during his testimony at the first trial, that he thought Graham had a gun.[11] Although the defendant

---

[11] During cross-examination, the following exchanges took place relating to the defendant's testimony at his first trial:

"[The Prosecutor]: And in fact, here today when you testified before this jury is the first time that you've ever said that you saw Jomol Graham reaching behind him with his arm pulling at—

"[The Defendant]: No.

\* \* \*

"[The Prosecutor]: Okay. And would you also agree that you testified on September 27, 2001, regarding the facts that you are testifying [about] here today—

admitted that he did not mention that fact in his statement to police, he quite forcefully replied numerous times that he had testified at his first trial that Graham was reaching for a gun. The court overruled defense counsel's objection. On redirect examination, however, the defendant referred to the transcript from his first trial and testified that his prior testimony was consistent with his present testimony.

Our Supreme Court has observed that "prosecutorial misconduct may occur during the course of cross-examination of witnesses." *State* v. *James G.*, 268 Conn. 382, 419, 844 A.2d 810 (2004). The record makes it clear that the prosecutor's questioning was an attempt to impeach the defendant's credibility by pointing out a prior inconsistent statement. "It is fundamental that for the purpose of impeaching the credibility of his testimony, a witness may be cross-examined as to statements made out of court or in other proceedings which contradict those made upon direct examination. . . . This is

"[The Defendant]: Yes.

"[The Prosecutor]:—correct? And even when you testified back on that date one year ago, you never indicated, in fact, you saw Jomol Graham going for what you thought was a weapon?

\* \* \*

"[The Prosecutor]: My question for you was at this point—right now— that it's the first time that you are fully testifying that what you saw was the victim, Jomol Graham, reaching for a gun—

"[The Defendant]: You're wrong. . . .

"[The Prosecutor]: Is that correct?

"[The Defendant]: No, that's not true.

\* \* \*

"[The Prosecutor]: You never testified, as you testified here today, that you actually saw—

"[The Defendant]: No, read the transcript.

"[The Prosecutor]:—Jomol Graham—

"[The Defendant]: You're wrong. . . .

"[The Prosecutor]: You never testified, as you did today, that you saw Jomol Graham reaching for a gun in his back pocket, correct?

"[The Defendant]: I didn't just say that I saw him reaching for a gun. What I thought was that when he was reaching, that he was reaching for a gun."

based on the notion that talking one way on the stand, and another way previously, raises a doubt as to the truthfulness of both statements." (Internal quotation marks omitted.) *State* v. *Valentine*, 240 Conn. 395, 411, 692 A.2d 727 (1997).

The prosecutor seemingly was unaware that the defendant's testimony at his first trial was in fact consistent with his present testimony. Her effort to impeach the defendant appears to be based on her mistaken understanding of the defendant's testimony at his first trial. Although the court overruled defense counsel's objection, defense counsel was able to rehabilitate the witness on redirect examination. As we have stated, "we will not speculate as to the reason [an] objectionable question was asked." *State* v. *Camacho*, 92 Conn. App. 271, 884 A.2d 1038 (2005). We find it questionable, however, whether the prosecutor's somewhat misguided attempt to impeach the defendant was anything more than an inadequate review of the transcript from the first trial. Even if we assume without deciding that the prosecutor's questions at issue were improper, we are not persuaded that her conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Serrano*, supra, 91 Conn. App. 240.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) Id.

The court allowed the questions; they were isolated and brief, and pursuant to our analysis of the six *Wil-*

*liams* factors, neither affected the integrity of the trial nor deprived the defendant of his due process right to a fair trial. The prosecutor's questioning during cross-examination did not distract from the critical issues in the case. The issues to be determined by the jury depended on the weighing of the credibility of several of the state's witnesses, who testified in a manner consistent with the defendant's having shot Graham without any provocation or intimidation from him. That testimony was contrasted by the defendant's version of events, which involved a fear that Graham was going to kill him. Although the credibility of the witnesses was central to the state's case, its case was overwhelmingly strong. Moreover, the state's case did not hinge merely on the credibility of one witness, which would have created a credibility contest between the defendant and that witness. Rather, the physical evidence supported the testimony of several eyewitnesses to the events leading to and during the shooting, including that of Barbera, who was in the kitchen when the defendant shot Graham. There was no evidence to suggest that those witnesses had any motivation to fabricate their account of the events leading to the shooting. The testimony of the witnesses, which was supported by the physical evidence, strongly supported the defendant's conviction. Finally, during cross-examination, the defendant vehemently denied that he had in any way altered his testimony from that given at his first trial. The court overruled defense counsel's objection to the prosecutor's questioning, and counsel was able to rehabilitate the defendant on redirect examination. Under those circumstances, we conclude that the prosecutor's conduct during cross-examination, when she questioned the defendant about his prior testimony, could not have prejudiced the defendant and deprived him of his right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.