# STATE OF CONNECTICUT *v.* FRANK HENRY SMITH
## (AC 25580)

Flynn, Harper and McDonald, Js.*

---

* The listing of judges reflects their status on this court as of the date of oral argument.

Argued January 5—officially released August 8, 2006

*Michael Stone*, special public defender, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Mark A. Stabile*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Frank Henry Smith, appeals from the judgment of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a and manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b. On appeal, the defendant claims that (1) the trial court improperly allowed the state to redact information from Hartford Hospital and the Life Star helicopter ambulance reports and (2) the prosecution

engaged in misconduct that deprived the defendant of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 9, 1997, the defendant and his girlfriend, Lois Nyberg, were involved in an accident on Route 198 in Eastford while riding on the defendant's motorcycle. Prior to the accident, the defendant and Nyberg had been drinking alcohol during the afternoon, first at their home and later at two bars. They left the second bar on the defendant's motorcycle, which he was operating. As they approached a curve in the road, the defendant failed to negotiate the curve and the motorcycle struck a guardrail. Both the defendant and Nyberg were thrown from the motorcycle. Nyberg struck the metal guardrail and suffered fatal head injuries. She was found dead at the scene. The defendant was thrown at a distance farther along the road and suffered severe bodily injuries in the form of a severe laceration to the left hand, severe lacerations of the right thigh and right hand, and fractures of the right femur, pelvis and several toes.

When the police arrived on the scene, the defendant was coherent and Trooper Kirk Hulburt of the state police understood from the defendant's answers to Hulburt's questions that the defendant had been the operator of the motorcycle. The defendant at the time interacted responsively with the police and emergency medical personnel. The defendant then was transported to Hartford Hospital by Life Star helicopter and remained there for about one month.

The issue of who was operating the motorcycle at the time of the accident was disputed at trial. The defendant testified that he had been the operator and Nyberg the passenger when they left the second bar, but shortly thereafter he had driven off the roadway and switched

places to allow Nyberg to drive. The defendant maintained that the accident occurred because Nyberg failed to negotiate the curve in the road. The state, to the contrary, presented evidence that the defendant had been operating the motorcycle at the time of the accident. The state produced the testimony of Trooper Michael T. Matthew, who performed an accident reconstruction analysis and testified that the injuries to the defendant were consistent with those of an operator of the motorcycle. The state also produced evidence that shortly before the accident, a man with a female passenger had been seen nearby driving the motorcycle.

The defendant was charged with operating a motor vehicle while under the influence of intoxicating liquor and manslaughter in the second degree with a motor vehicle. After a trial, the jury found the defendant guilty of both charges. On May 12, 2000, the court granted the defendant's motion to merge the conviction on the two charges and sentenced the defendant to ten years incarceration. This appeal followed.[1]

I

The defendant claims that the court improperly allowed the state to redact information from the Life Star helicopter ambulance reports and Hartford Hospital reports identifying him as the passenger and Nyberg as the operator of the motorcycle. The defendant claims that references to him as a passenger were either relevant to his medical treatment or admissible to rebut the state's claim that he recently contrived his version of the circumstances as to where Nyberg became the operator of the motorcycle. We do not agree.

[1] This appeal follows the habeas court's restoration of the defendant's right to appeal from his conviction pursuant to a judgment by stipulation of the parties. The defendant had not exercised his right to appeal within twenty days of conviction.

The standard governing our review of the court's evidentiary rulings is as follows. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Skakel,* 276 Conn. 633, 723, 888 A.2d 985 (2006).

The following additional facts are pertinent to the defendant's claims. Following the accident, the defendant was transported from the accident scene to Hartford Hospital by Life Star helicopter. At trial, the reports relating to the care and treatment of the defendant on the Life Star helicopter and at Hartford Hospital were offered by the defendant and the state, respectively, and admitted into evidence as business records under § 8-4 of the Connecticut Code of Evidence.[2] The state, at the time, asked that those portions of the medical records that included references to the defendant being the passenger and Nyberg as the operator be redacted because they were unrelated to the defendant's medical treatment. The defendant made a timely objection. The court granted the state's request to redact the applicable

[2] Connecticut Code of Evidence § 8-4 (a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

portions of the medical records as being inadmissible as hearsay within hearsay under § 8-7 of the Connecticut Code of Evidence.[3]

"General Statutes § 52-180 (a) provides in relevant part: Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter. . . .

"However, [o]nce these criteria have been met by the party seeking to introduce the record . . . it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . For example, the information contained in the record must be relevant to the issues being tried. . . . In addition, the information contained in the report must be based on the entrant's own observation or on information of others whose business duty it was to transmit it to the entrant. . . . If the information does not have such a basis, it adds another level of hearsay to the report which necessitates a separate exception to the hearsay rule in order to justify its admission." (Citation omitted; internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 830–31, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126.S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "Hearsay within hearsay is admissible only if each part of the combined statements is independently admissible

---

[3] Connecticut Code of Evidence § 8-7, titled, "Hearsay within Hearsay," provides: "Hearsay within hearsay is admissible only if each part of the combined statements is independently admissible under a hearsay exception."

under a hearsay exception." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 64, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); see also Conn. Code Evid. § 8-7; *State* v. *Lewis*, 245 Conn. 779, 802, 717 A.2d 1140 (1998) ("[w]hen a statement is offered that contains hearsay within hearsay, each level of hearsay must itself be supported by an exception to the hearsay rule in order for that level of hearsay to be admissible").

Furthermore, "in the context of hospital reports, we have concluded that only the portions of a hospital report associated with the business of a hospital, that is the information relevant to the medical treatment of a patient, are admissible pursuant to the business records exception. . . . We have reached a similar result with regard to a physician's report and have stated that [o]nce the report is ruled admissible under the statute, any information that is not relevant to medical treatment is subject to redaction by the trial court." (Internal quotation marks omitted.) *Gil* v. *Gil*, 94 Conn. App. 306, 320, 892 A.2d 318 (2006).

With these principles in mind, we turn to the case at hand. The defendant argues that the redacted portions of the medical reports were relevant to his medical treatment and should not have been redacted. The medical treatment exception applies to statements "made for purposes of obtaining medical treatment or advice pertaining thereto and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical treatment or advice." (Internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 814, 865 A.2d 1135 (2005).

We conclude that the court correctly determined that this exception cannot apply to the references to the

defendant as the passenger because information regarding who was operating the motorcycle was not necessary to treatment. We have stated that "[b]ecause statements concerning the cause of injury or the identity of the person responsible are generally not germane to treatment, they are not allowed into evidence under the medical treatment exception." *State* v. *Dollinger*, 20 Conn. App. 530, 534, 568 A.2d 1058, cert. denied, 215 Conn. 805, 574 A.2d 220 (1990). We find persuasive the state's arguments that whether the defendant was the operator or the passenger did not have any bearing on his medical treatment.

We also find support in the record for the court's conclusion. Richard E. Whitehouse, an emergency medical technician who provided medical care to the defendant, testified that "how the accident occurred" was "[not] germane to his injuries" and was not important for the purposes of treatment.

Accordingly, we conclude that the references to the defendant as passenger were not germane to his treatment. We therefore agree with the court's determination that the redacted portions of the medical reports were not relevant to treatment and, thus, were not admissible under this exception.

The defendant also argues that the unredacted medical records should have been admitted in order for him to rebut the state's claim that he recently had contrived his testimony as to where Nyberg became the operator just prior to the accident.

The following additional facts are relevant to our resolution of the defendant's claim. At trial, in support of his claim that Nyberg had been operating the motorcycle when the accident occurred, the defendant testified that he had driven off the roadway to change positions with Nyberg, but could not recall the exact

location where he had done so. That testimony, however, was inconsistent with the statement the defendant had given to the police after his arrest on March 27, 1998, in which he stated that he had stopped at a fire station on Route 198 heading north. The police statement also did not conform to the testimony of the state's witness, George Douton, owner of the Bach Dor Cafe,[4] who had witnessed a man driving the motorcycle on Route 198 with a female passenger moments before the accident. Douton testified that the motorcycle did not stop at the fire station before the accident.

Douton also testified that a couple of days after the accident, the defendant's brother, John Smith, who was a friend of Douton, called him and that the two discussed the accident. During the conversation, Douton described to Smith what he described to the court at trial. Douton testified at trial that he saw that the motorcycle did not stop at the fire station along the road. When the defendant testified two days after Douton's testimony, he stated that he could not recall the exact location at which he and Nyberg had stopped to change positions on the motorcycle.

After his arrest on March 27, 1998, however, about five and one-half months after the accident, the defendant gave the police a statement in which he first stated that Nyberg asked if she could drive, to which he agreed, and that she sat in the front of the motorcycle and he sat in the back. He then stated that he would like to correct himself and stated that he had "[driven] the motorcycle out of the [Bach Dor Cafe] parking lot onto Route 6 and turned left onto Route 198 heading north." He then stated that he had "pulled over at a fire station and [that Nyberg] got on the front of the motorcycle in the driver's seat. I got on the back."

[4] The Bach Dor Cafe was the bar that the defendant and Nyberg visited prior to the accident.

"If the credibility of a witness is impeached by . . . a suggestion of recent contrivance, evidence of a prior consistent statement *made by the witness* is admissible, in the discretion of the court, to rebut the impeachment." (Emphasis added.) Conn. Code Evid. § 6-11 (b); *State* v. *Orellana*, 89 Conn. App. 71, 93–94, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005).

It is not clear from the record if indeed the defendant was the source of the redacted information. The medical records at issue do not indicate who provided the accident history to the medical personnel. The defendant himself does not claim that he made any statement that resulted in the creation of the medical record making reference to him as the passenger on the motorcycle. Furthermore, the redacted information did not rebut the state's claim that the defendant recently fabricated the location where Nyberg began driving the motorcycle. Accordingly, we reject the defendant's argument as to the redacted portions of the medical records.

II

The defendant next claims that the prosecutor engaged in misconduct during cross-examination by assuming facts that were not in evidence and by mischaracterizing evidence, thereby depriving him of a fair trial. The defendant claims that the prosecutor asked misleading questions during cross-examination that implied that he was inconsistent in his testimony about who was operating the motorcycle at the time of the accident. We disagree.

"In examining claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.)

*State* v. *Schiavo,* 93 Conn. App. 290, 302, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006).

"The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [The court] must view the prosecutor's comments in the context of the entire trial. . . . [T]he fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted. . . . The factors to be considered in assessing the prosecutor's actions include the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Hedge,* 93 Conn. App. 693, 702–703, 890 A.2d 612, cert. denied, 277 Conn. 930, 896 A.2d 102 (2006), quoting *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987).

With regard to a defendant's unpreserved claim, our Supreme Court has stated that in cases involving incidents of prosecutorial misconduct to which no objection has been made, "it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . [*State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989)] . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his

right to a fair trial, and this determination must involve the application of the [*Williams*] factors . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Skakel*, supra, 276 Conn. 742–43, citing *State* v. *Williams*, supra, 204 Conn. 540.

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged incidents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in [due process] claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis, and the specific *Golding* test, therefore, is superfluous. In light of these observations . . . following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Skakel*, supra, 276 Conn. 743–44.

We previously have set forth the evidence presented as to the circumstances when the defendant claimed

Nyberg became the operator of the motorcycle before the accident. During cross-examination, in an effort to impeach the defendant's credibility, the prosecutor attempted to point out inconsistencies in his statements and to expose his interest in making the statements that he did.[5] "It is fundamental that for the purpose of

[5] Following the defendant's testimony that he had been the passenger on the motorcycle and that Nyberg had been operating the motorcycle when the accident occurred, the prosecutor, in an effort to impeach the defendant, questioned him about inconsistencies in his testimony. The following exchange took place:

"Q. Isn't it a fact that you started telling Trooper Hulburt that Lois Nyberg was driving the motorcycle from the Bach Dor, but then you remembered George Douton saw you on Route 198; isn't that right? And so you changed your statement.

"A. I had no idea there was an eyewitness.

"Q. Your brother told you George Douton saw you on Route 198, didn't he?

"A. At some point.

"Q. . . . And so your testimony is that you didn't know this at the time of your statement.

"A. No, I didn't. I don't believe so.

"Q. So, you are in a motorcycle accident in October of 1997. You're seriously injured. Someone's killed. A couple of days after that, your brother is told that a motorcycle fitting your description and a person fitting the description of you and Lois Nyberg is operating on Route 198. And you're telling me that at some point, he told you that that person saw you—George Douton saw you—but it wasn't before you gave your statement on March 27 of 1998; is that your testimony?

"A. I believe he told my brother we were never at the bar, and that was all he told him.

"Q. . . . And you knew George Douton had seen you on Route 198, so you figured if you change your story from Lois Nyberg driving from the Bach Dor to you switching at the fire station, you would have been beyond where George Douton would have seen you; isn't that right?"

At this point, the defendant's counsel objected, stating: "Your Honor, the question assumes facts not in evidence. The witness said he did not know that George Douton had seen him." After some discussion between counsel, the court stated, "Go ahead. You may ask your question." The state then continued its cross-examination as follows:

"Q. You figured if you had the story where yourself and Lois Nyberg switched at the fire station on Route 198 that you would have been beyond the area where George Douton would have seen you; is that right?

"[Defense Counsel]: I have an objection, Your Honor; that's argument. . . .

"The Court: It's cross-examination. And I allowed you wide latitude, [defense counsel], and I'll allow [the prosecutor] wide latitude. You may

impeaching the credibility of his testimony, a witness may be cross-examined as to statements made out of court or in other proceedings which contradict those made upon direct examination. . . . This is based on the notion that talking one way on the [witness] stand, and another way previously, raises a doubt as to the truthfulness of both statements." (Internal quotation marks omitted.) *State* v. *Schiavo*, supra, 93 Conn. App. 306–307. "Although trial courts are vested with broad authority to limit the scope of cross-examination, they must be mindful that it remains the best vehicle for discovering the truth and is to be vigilantly guarded." *State* v. *Cortes*, 276 Conn. 241, 255, 885 A.2d 153 (2005).

The state's cross-examination of the defendant to impeach his credibility was well within the accepted functions of cross-examination. Accordingly, we conclude that no misconduct occurred. In addition, even if we were to assume that the prosecutor's questions were improper, we are not persuaded after following the dictates of *Skakel*, that his conduct was such that it deprived the defendant of his due process right to a fair trial. See *State* v. *Schiavo*, supra, 93 Conn. App. 301.

The judgment is affirmed.

In this opinion the other judges concurred.

---

answer the question.

"A. I did not know there was an eyewitness."

Cross-examination of the defendant continued, and during the course of questioning the defendant as to the events immediately following the accident, the following transpired:

"Q. And Trooper Hulburt came down and you indicated to him that you were driving the motorcycle.

"A. No, I did not. And he also said that, that I wasn't driving.

"Q. He told you [that] you weren't driving?

"A. His statement on the [witness] stand is, 'I never asked him that, and he never said that.'

"Q. Thank you for clarifying that to me. But, at the scene, Trooper Hulburt asked you if anything had caused you to go off the road, and you indicated that you were driving the motorcycle, and nothing came out into the roadway to cause you to go off the road; isn't that right?

"A. That's not right."