******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARK STUART *v.* RICHARD BLUMENTHAL,
ATTORNEY GENERAL, ET AL.
(AC 35870)

Sheldon, Keller and Lavery, Js.

*Argued January 8—officially released August 4, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Schuman, J.)

*Patrick Tomasiewicz*, with whom was *Mario Cer-
ame*, for the appellant (petitioner).

*James M. Ralls*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attor-
ney, and *John Fahey*, senior assistant state's attorney,
for the appellees (respondents).

*Opinion*

LAVERY, J. The petitioner, Mark Stuart, appeals from the judgment of the trial court denying his amended petition for a new trial. On appeal, the petitioner claims that the trial court abused its discretion in denying his petition on the ground that he had failed to establish an "other reasonable cause" to grant his petition pursuant to General Statutes § 52-270 (a). We disagree and, accordingly, affirm the judgment of the trial court.

In May, 2006, following a jury trial, the petitioner was convicted of three counts of larceny in the first degree in violation of General Statutes § 53a-122, three counts of conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-48 and 53a-122, three counts of forgery in the second degree in violation of General Statutes § 53a-139, nine counts of possession of a motor vehicle with an altered vehicle identification number in violation of General Statutes § 14-149, nine counts of conspiracy to possess a motor vehicle with an altered vehicle identification number in violation of §§ 53a-48 and 14-149, and one count of improper use of a motor vehicle registration in violation of General Statutes § 14-147.

The relevant facts related to the petitioner's conviction, as could have reasonably been found by the jury, are set forth in *State* v. *Stuart*, 113 Conn. App. 541, 967 A.2d 532, cert. denied, 293 Conn. 922, 980 A.2d 914 (2009). "On December 9, 2004, an airplane patrolling for the state police picked up a LoJack signal emanating from a parking lot in Glastonbury. LoJack is a motor vehicle transmitting or homing device that can be activated to emit a unique signal if a car is stolen. It allows law enforcement personnel to locate a stolen vehicle by entering the vehicle's VIN[1] into a tracking computer that is capable of activating and locating its unique signal. The pilot alerted Glastonbury police and directed them to the parking lot. The police found the parking lot and identified an Escalade as the vehicle that was broadcasting the signal. The police also matched the make, model, year and color of the vehicle with information provided by the LoJack system. The Escalade had a 'for sale' sign in the window with a telephone number on it. The telephone number was identified as belonging to the [petitioner]. The license plates on the Escalade were registered to a different vehicle, a Chevrolet Lumina owned by Joanne Arena, the [petitioner's] former wife.

"When the police questioned the [petitioner] about the Escalade, he stated that he did not know that it was stolen and that he had purchased it from Ozvaldo Seda the night before. The [petitioner] then brought to the attention of the police a certificate of title to a Navigator, which he stated he had also purchased from Seda. The Navigator certificate was later found to be

fraudulent. The Escalade certificate of title was found to contain irregularities, including nonmatching VINs, and was also shown to be counterfeit. After obtaining a search warrant, the police searched the [petitioner's] driveway, which contained approximately six additional vehicles, including a Navigator and a Corvette. The police found irregularities on several of the Corvette's VINs and the Navigator's VINs, and it was later determined that these VINs had been altered. The Escalade was also found to have altered VINs. The Corvette, Navigator and Escalade were all seized by the police.

"Inside the [petitioner's] house, the police found a New Jersey certificate of title to the Corvette, which was later confirmed by New Jersey officials to be counterfeit. There were such a large number of other documents in the house relating to motor vehicles that an investigating officer testified at trial that it appeared as though some sort of an automobile business was being run out of the house. Among those papers was a note, written by the [petitioner], with the name 'Ozzie,' Seda's nickname, written on it. The note was dated December 3, 2004, which was approximately three days before the Escalade was stolen, and stated: '$21,500 for Escalade to Ozzie' and '$11,000 to Ozzie for Navigator.'

"At trial, a witness, Alfred Maldonado, testified that he had met the [petitioner] through Seda. Seda had a car dealership and had purchased several vehicles from Maldonado. Maldonado testified that he had met with the [petitioner] and Seda in Hartford where the [petitioner] paid $10,000 for the Navigator and $20,000 for the Escalade. Maldonado testified that during this transaction, he indicated to the [petitioner] that the vehicles were stolen. On December 14, 2004, Maldonado was arrested for an attempted transfer of another vehicle to Seda. He pleaded guilty to those charges and was sentenced to eighteen months incarceration." (Footnote added.) Id., 545–47.

On May 18, 2006, the trial court sentenced the petitioner to a total effective sentence of twenty years incarceration, execution suspended after ten years, followed by five years of probation. On direct appeal, this court affirmed in part and reversed in part the judgments, holding that the double jeopardy clause of the federal constitution required the vacation of twelve counts and that there was insufficient evidence to convict on four counts.[2] Id., 555–69. Specifically, this court held, inter alia, that "there was . . . sufficient evidence to support the [petitioner's] conviction of conspiracy to possess stolen vehicles and conspiracy to possess vehicles with altered VINs as to the Escalade and the Navigator but not as to the Corvette." Id., 545. On remand, the petitioner received the same sentence as that imposed previously. In August, 2011, the petitioner was released on probation after being incarcerated for approximately five years.

On April 9, 2013, the petitioner filed an amended petition for a new trial,[3] primarily to support his effort to obtain the reinstatement of his license to practice dentistry. The petitioner brought this action against the respondents, the Attorney General and the Commissioner of Correction (respondents).[4] In his amended petition, the petitioner argued in relevant part that a new trial is required for two reasons. First, he argued that a new trial is required based on newly discovered evidence, specifically, that Maldonado told two of his fellow inmates that the petitioner did not know that the vehicles were stolen.[5] Second, he contended that a new trial is required because of prosecutorial impropriety, specifically, the prosecutor's failure to correct Maldonado's misstatement on cross-examination that he would not receive a lighter sentence in exchange for his testimony and, in fact, could be subjected to additional jail time if he testified against the petitioner at his criminal trial.[6]

The following additional facts concerning Maldonado's criminal trial, as stipulated to by the parties on April 22, 2013, after the petitioner filed his amended petition for a new trial, are also relevant to our resolution of the present appeal. The parties stipulated that in February, 2006, an in-chambers, pretrial hearing was held before the court, *Norko, J.*, regarding Maldonado's criminal cases, one case involving a Dodge Ram and the other case involving the Escalade and the Navigator. The plea offer made to Maldonado through his attorney "was a cap of [ten] years on the pending charges in the absence of cooperation or [five] years if [Maldonado] cooperated with the State in the case against [the petitioner], with the right to argue for less depending on the level of cooperation." A hearing was then held before the court, *Cofield, J.*, at which both Maldonado and his counsel were present in the courtroom. Judge Cofield, the petitioner's attorney, Maldonado's attorney, and the prosecutor were all aware of and discussed the plea offer that had been made to Maldonado prior to his testimony during the petitioner's criminal trial.

On June 20, 2013, after a trial to the court, *Schuman, J.*, the court issued a written ruling denying the petitioner's amended petition for a new trial. In its decision, the court stated: "The relevant facts begin with the following colloquy with the court [and the petitioner's trial counsel, John Franckling] prior to Maldonado's testimony [at the petitioner's criminal trial]:

"The Court: All right. And, Attorney Franckling, you know that during cross-examination you are free to question [Maldonado] about whether any promises have been made to him.

"[Attorney Franckling]: That's correct. And there was one issue, my understanding of [Maldonado's] offer is that it is—and I'm sure [the prosecutor] will correct

me or [Maldonado's attorney] will correct me—that is a cap of ten and a floor of five. What I would—my only concern is that when I'm questioning him about that, I think it would be inappropriate—and I don't know if she would do this or not—that it came from a judicial pretrial, I assume to cite.

"The Court: I don't know that.

"[Attorney Franckling]: But that's the court's offer, isn't it? That's not my offer. And I think that would be inappropriate because that would lend some judicial sanction to [Maldonado's] credibility.

"[The Prosecutor]: The state would agree not to bring up where that offer came from. . . .

"During the state's direct examination of Maldonado, the state did not ask about Maldonado's plea offer, nor did Maldonado mention it. On cross-examination, Franckling's inquiry proceeded as follows:

"Q. Notwithstanding your criminal history, you have a very beneficial offer from the state of Connecticut to resolve your matters. Correct?

"A. No.

"Q. It's not as beneficial as you'd like it to be, is it?

"A. No.

"Q. But it's much more beneficial than if you had not testified against [the petitioner]. Correct?

"A. No.

"Q. Are you telling me that there is not an offer—Withdrawn. You're telling us that there's not a cap on your offer? If you don't testify, you get the cap, and if you do testify, you get the four [or five years]?

"A. I don't understand. What's a cap?

"Q. The most that you're going to get.

"A. They just gave me a number. That's all. That's so far that I know of.

"Q. They gave you two numbers. Right?

"A. Yes.

"Q. A high number—

"A. And a low number.

"Q. —And a lower number.

"A. That's correct.

"Q. You won't characterize it as a lower number, but it's lower than the cap. Right?

"A. Correct.

"Q. But if [you] testify today, you get the lower number, don't you?

"A. No.

"Q. What do you get?

"A. Probably more time.

* * *

"Q. And you had a cap. In other words, a higher number and a floor of four or five years. Correct?

"A. Um-hmm.

"Q. And the five years was for—was if you testified against [the petitioner]?

"A. No. . . .

"The state conducted no redirect examination. At no point during the trial did the state correct Maldonado's misstatement that he would not receive a lighter sentence if he testified against the [petitioner]. In its opening summation, the state did not mention Maldonado or his testimony. However, during the defense summation, [Franckling] argued as follows: And [Maldonado] said he wasn't sure what his offer was. But we know if he didn't testify, he's got one high number, and if he did testify, he's got a low number.

"In its rebuttal summation, the state responded as follows: Go back and listen to the testimony again. It wasn't a high number if [Maldonado] didn't testify, and a low number if he did testify. He didn't know. He knew what the range was, what his offer was, but he didn't know what he would get as far as time based on his testimony. As a matter of fact, he testified, I'll probably get more [time] now. So, he testified at his [peril] knowing that he would probably get more jail time because he testified about his relationship with [the petitioner] in the stolen motor vehicles in question, and the forged documents in question. [Maldonado] was a conspirator in this case along with [Seda and the petitioner]." (Citations omitted; internal quotation marks omitted.)

The court concluded that the petitioner's claim that the state failed to correct Maldonado's misstatements was not appropriate for consideration on this petition for a new trial because it found that the petitioner could have raised it both at trial and on direct appeal. With respect to his ability to raise this claim at his criminal trial, the court noted that the petitioner "had both the facts and the law necessary to raise the [prosecutor's] failure to act before the trial court." The court further noted that although the petitioner did not, in fact, raise this claim during the criminal trial, he could have sought appellate review of the unpreserved claim of prosecutorial impropriety.[7]

Further, the court noted that even if the petitioner did raise this claim properly in his amended petition for a new trial, his claim would fail on the merits. In reliance on *State* v. *Ouellette*, 295 Conn. 173, 186, 989 A.2d 1048 (2010), the court concluded that, although "the prosecutor . . . failed to uphold the highest stan-

dards of her profession," her failure to correct the misleading testimony of Maldonado did not "[affect] the judgment of the jury." (Internal quotation marks omitted.) The court set forth three reasons in support of its conclusion: (1) "the state neither elicited nor exacerbated the inaccurate testimony," (2) "the court provided a lengthy instruction on accomplice testimony,"[8] and (3) "the state had a strong circumstantial case against the petitioner wholly independent of Maldonado's testimony." With respect to the strength of the state's circumstantial case against the petitioner, the court noted that "Maldonado's testimony contributed only marginally to the state's case," and "Franckling impeached Maldonado thoroughly and yet the jury still convicted [the petitioner]." Having rejected the prosecutorial impropriety ground, the court also rejected the newly discovered evidence ground and denied the petition. On July 22, 2013, the petitioner filed the present appeal.

As a preliminary matter, we set forth our standard of review. "Our standard of review of a court's decision with respect to a petition for a new trial is the abuse of discretion standard. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did. . . . [T]he proceeding is essentially equitable in nature; the petitioner has the burden of alleging and proving facts which would, in conformity with our settled equitable construction of the statutes, entitle him to a new trial on the grounds claimed . . . ." (Citations omitted; internal quotation marks omitted.) *Fitzpatrick* v. *Hall-Brooke Foundation, Inc.*, 72 Conn. App. 692, 697, 807 A.2d 480, cert. denied, 262 Conn. 914, 811 A.2d 1291 (2002).

We now turn to the relevant principles of substantive law that guide us in our analysis. As noted, the petitioner based his amended petition for a new trial in part on the "other reasonable cause" provision of § 52-270 (a). Section 52-270 (a) provides in relevant part: "The Superior Court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed, or the want of actual notice to any plaintiff of the entry of a nonsuit for failure to appear at trial or dismissal for failure to prosecute with reasonable diligence, *or for other reasonable cause, according to the usual rules in such cases*. . . ." (Emphasis added.)

Our appellate courts have limited the circumstances in which reasonable cause to grant a petition for a new trial may be found. "Although . . . § 52–270 permits the court to grant a new trial upon proof of reasonable cause, the circumstances in which reasonable cause

may be found are limited. . . . The basic test of reasonable cause is whether a litigant, despite the exercise of due diligence, has been deprived of a fair opportunity to have a case heard on appeal. . . . A new trial may be granted to prevent injustice in cases where the usual remedy by appeal does not lie or where, if there is an adequate remedy by appeal, the party has been prevented from pursuing it by fraud, *mistake* or accident. . . .

"Due diligence is a necessary condition to success in prosecuting a petition for a new trial. . . . Under § 52-270 the exercise of due diligence is a condition precedent to a finding of reasonable cause. . . . Reasonable is a relative term which varies in the context in which it is used, and its meaning may be affected by the facts of the particular controversy. . . . It is also synonymous with [e]quitable, fair, just. . . . [Section 52-270] does not furnish a substitute for, nor an alternative to, an ordinary appeal, but applies only when no other remedy is adequate and when in equity and good conscience relief against a judgment should be granted." (Citations omitted; emphasis altered; internal quotation marks omitted.) *Jacobs* v. *Fazzano*, 59 Conn. App. 716, 724, 757 A.2d 1215 (2000). Having set forth the relevant background facts and procedural history, the appropriate standard of review, and the relevant principles of substantive law that guide our analysis, we now turn to the petitioner's claim on appeal.

As noted, the petitioner's sole claim on appeal is that the court abused its discretion in denying his amended petition for a new trial on the basis that he had failed to establish an "other reasonable cause" to grant his petition pursuant to § 52-270 (a). Specifically, the petitioner argues that "the trial court correctly found mistake by trial and appellate counsel for failing to raise the issue of prosecutorial impropriety at trial and on appeal . . . ." Further, the petitioner argues that "[d]ue to mistakes by trial and appellate counsel, the [petitioner] did not have the opportunity to raise the [claim of] prosecutorial impropriety at trial or on appeal," depriving him of his due process right to a fair trial under the fourteenth amendment to the United States constitution. The petitioner, accordingly, does not address whether there was an adequate remedy by appeal, but instead argues that he was prevented from pursuing such relief due to the mistake of his trial and appellate counsel.[9]

Generally, our appellate courts have declined to grant a new trial if the petitioner's mistake could have been prevented by the exercise of due diligence. See, e.g., *Tilo Co.* v. *Fishman*, 164 Conn. 212, 214–15, 319 A.2d 409 (1972) (plaintiff not entitled to new trial on ground that it had lost right of appeal from judgment due to delay in issuance of notice of decision and judgment as plaintiff had twenty days after issuance of delayed

notice within which to file appeal but failed to do so); *Milestan* v. *Tisi*, 140 Conn. 464, 469, 101 A.2d 504 (1953) (alleged mistake of defendant was made after rendering of judgment and was not basis for new trial on ground of mistake); *Murphy* v. *Zoning Board of Appeals*, 86 Conn. App. 147, 156–57, 860 A.2d 764 (2004) (property owners' mistake in interpreting rules of practice did not entitle them to new trial), cert. denied, 273 Conn. 910, 870 A.2d 1080 (2005); *Fitzpatrick* v. *Hall-Brooke Foundation, Inc.*, supra, 72 Conn. App. 700 (court not persuaded that party's untimely appeal was kind of " 'mistake' " that warrants new trial); *Hryniewicz* v. *Wilson*, 51 Conn. App. 440, 445–46, 722 A.2d 288 (1999) (defendants' failure to refile motion to strike following amendment of complaint showed lack of due diligence and, therefore, did not constitute reasonable cause warranting new trial). Here, the court expressly found that the petitioner's failure to raise the claim of prosecutorial impropriety could have been prevented by the exercise of due diligence. The petitioner has not demonstrated that this finding was erroneous.

The court reasonably concluded that "the petitioner had both the facts and the law necessary to raise the state's failure to act before the trial court [and on direct appeal]." It is apparent from the trial transcripts and the parties' stipulation of facts that Franckling was fully aware of the plea offer that Maldonado had received in exchange for his testimony in advance of the petitioner's criminal trial. Franckling was present during an in-chambers judicial pretrial conference before the court, *Cofield, J.*, at which time the plea offer made to Maldonado was discussed. At the petitioner's criminal trial, Franckling questioned Maldonado on cross-examination regarding the plea offer that had been made to him. Additionally, during the defense's closing argument, Franckling noted that, "we know if [Maldonado] didn't testify, he's got one high number, and if he did testify, he's got a low number." In light of this factual record, we agree with the trial court that the petitioner was able to bring this matter to the attention of the court and that he was not deprived of an opportunity to raise this matter on appeal.

The petitioner has not demonstrated that his failure to raise his claim of prosecutorial impropriety at his criminal trial or on direct appeal was the result of mistake. The respondents note correctly that the court "held only that counsel failed to raise the claim earlier, not that this failure constituted a 'mistake' or error," as argued by the petitioner. Our case law does not equate the failure of a petitioner to raise a claim that the court found he could have brought at trial or on direct appeal to a "mistake" warranting a new trial under § 52-270 (a). See, e.g., *Fitzpatrick* v. *Hall-Brooke Foundation, Inc.*, supra, 72 Conn. App. 696–97 (holding that trial court improperly granted new trial under reasonable cause provision of § 52-270 where petitioner

had opportunity to appeal and did appeal from default judgment, although in untimely manner).

Indulging every reasonable presumption in favor of the correctness of the court's decision; see id., 697; we conclude that the court did not abuse its discretion in denying the petitioner's amended petition for a new trial. We are not persuaded that the failure of the petitioner's trial and appellate counsel to raise a claim of prosecutorial impropriety constituted a "mistake" warranting a new trial. Accordingly, we conclude that this case does not present a situation in which a litigant has been deprived of a fair opportunity to have his case heard on appeal so as to constitute an "other reasonable cause" or any other ground entitling him to a new trial pursuant to § 52–270.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] VIN is an abbreviation for "vehicle identification number."

[2] In reaching this conclusion, this court also relied on the due process guarantees of article first, § 9, of the Connecticut constitution. *State* v. *Stuart*, supra, 113 Conn. App. 557.

[3] The petitioner filed his petition for a new trial on July 11, 2007, and the petition was therefore brought within three years of the judgments. See General Statutes § 52-582 ("[n]o petition for a new trial in any civil or criminal proceeding shall be brought but within three years next after the rendition of the judgment or decree complained of").

[4] We note that the petitioner named as the respondents former Attorney General Richard Blumenthal and former Commissioner of Correction Theresa C. Lantz.

[5] On appeal, the petitioner does not claim that his amended petition for a new trial improperly was denied on the basis of newly discovered evidence.

[6] In his amended petition, the petitioner withdrew counts two, three, four, and five, and he added a sixth count.

[7] Given the nature of his claim, the petitioner could have raised it on direct appeal without satisfying the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Our Supreme Court has noted that "the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)." *State* v. *Stevenson*, 269 Conn. 563, 573, 849 A.2d 626 (2004).

[8] The court's instructions at the criminal trial expressly informed the jurors that "[i]n weighing the testimony of an accomplice who has not yet been sentenced or whose case has not yet been disposed, you should keep in mind that he may, in his own mind, be looking for some favorable treatment in the sentence or imposition of his own case." The court also instructed the jurors to look at accomplice testimony with "particular care" and "scrutinize it very carefully before [accepting] it." Further, the court reminded the jury that Maldonado had a criminal record, and there was evidence that he had made prior inconsistent statements to an investigator, Donald Gates.

[9] We note that after the parties filed their briefs in this appeal, but prior to the time of oral argument, our Supreme Court, in *State* v. *Jordan*, 314 Conn. 354, 358, 102 A.3d 1 (2014), held that the prosecutor's failure to correct the potentially misleading testimony of two witnesses denying that they were promised benefits by the state in exchange for their testimony against the defendant in that case did not violate his due process right to a fair trial. In *Jordan*, the court reasoned that where a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant, and "reversal [of the defendant's conviction] is virtually automatic . . . unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury." (Emphasis omitted; internal quotation marks omitted.) Id., 370–71. Ultimately, "the state's case [in *Jordan*] did not depend on the testimony

of [the two witnesses] because the state presented overwhelming evidence independent of that testimony connecting the defendant to the crime." Id., 372–73.

In the present case, the petitioner's reliance on *Jordan* is undermined by several factors. First, *Jordan* did not involve a petition for a new trial under § 52-270 but, rather, was a direct appeal from a criminal conviction. Second, the defendant in *Jordan* raised a claim of prosecutorial impropriety on direct appeal, whereas the petitioner in the present case did not. See id., 357–58, 364–65. Third, as the respondents noted correctly at oral argument, the *Jordan* rule is implicated by "the [state's] knowing use of perjured testimony" to obtain a conviction, and the court here never made a factual finding that Maldonado perjured himself. Id., 370.

---